M. Victoria CUMMOCK, Appellant,

v.

Albert GORE, Jr., et al., Appellees.

No. 98-5427.

United States Court of Appeals, District of Columbia Circuit.

Argued April 22, 1999.

Decided June 18, 1999.

Herbert L. Fenster argued the cause for appellant. With him on the briefs were Michael J. Haungs and Todd A. Suko.

Michael S. Raab, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were David W. Ogden, Acting Assistant Attorney General, Wilma A. Lewis, U.S. Attorney, Mark B. Stern, Attorney, U.S. Department of Justice, Nancy E. McFadden, General Counsel, U.S. Department of Transportation, Paul M. Geier, Assistant General Counsel, and Peter J. Plocki, Senior Trial Attorney.

Before: EDWARDS, Chief Judge, WALD and ROGERS, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

Concurring opinion filed by Circuit Judge ROGERS.

EDWARDS, Chief Judge:

On August 22, 1996, in the aftermath of the TWA Flight 800 air disaster, President Clinton established the White House Commission on Aviation Safety and Security ("Commission"). The Commission was chaired by Vice President Gore and included among its members appellant M. Victoria Cummock, who was widowed in the 1988 Pan Am Flight 103 crash and has been an active advocate for improved safety and security measures ever since. Cummock dissented from the Commission's final report, which was delivered to the President on February 12, 1997. Subsequently, she filed this lawsuit, seeking declaratory and injunctive relief against the Government for a host of Federal Advisory Committee Act ("FACA") and Administrative Procedure Act ("APA") violations. Cummock alleged that, due to various procedural irregularities beginning before the Commission's official inception and lasting through its disbandment six months later, she was excluded from meaningful participation in the Commission's deliberations.

The District Court dismissed Cummock's lawsuit in its entirety, finding that she lacked either an enforceable right or standing with respect to each of her claims. On appeal, we find that Cummock raises only one claim warranting our consideration: her allegation that the Commission violated FACA by denying her access to certain documents and information, and thereby compromised her ability to participate in Commission proceedings and prepare a fully informed dissent. We reject the Government's contention that Cummock, as a committee member, possessed only those rights enjoyed under FACA by members of the general public. Like members of the public, Cummock has an enforceable right to obtain information pursuant to § 10(b) of FACA. However, Cummock also has a right to fully participate in the deliberations of the Commission. To hold otherwise would completely undermine the stated purposes of FACA. On the record at hand, we find that Cummock was unlawfully denied the opportunity to review documents that were prepared for or relied upon by the Commission in formulating its recommendations, and to amend her dissent if necessary to reflect this information. Accordingly, we reverse the decision of the District Court and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Federal Advisory Committee Act

Congress passed FACA, 5 U.S.C. app. 2 §§ 1–16, in 1972 to address whether and to what extent committees, boards, and councils should be maintained to advise Executive Branch officers and agencies. *See* 5 U.S.C. app. 2 § 2(a); *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 445–46, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989). "FACA was enacted to cure specific ills, above all the wasteful expenditure of public funds for worthless committee meetings and biased proposals...." *Id.* at 453, 109 S.Ct. 2558; *accord Natural Resources Defense Council v. Pena*, 147 F.3d 1012, 1026 (D.C.Cir.1998) ("*NRDC*"). Congress recognized that advisory committees "are frequently a useful and beneficial means of furnishing expert advice, ideas, and diverse opinions to the Federal Government." 5 U.S.C. app. 2 § 2(a). However, Congress also feared the proliferation of costly committees, which were often dominated by representatives of industry and other special interests seeking to advance their own agendas. *See* H.R.REP. No. 92–1017 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3491, 3496 ("One of the great dangers in the unregulated use of advisory committees is that special interest

groups may use their membership on such bodies to promote their private concerns."); *see also Public Citizen,* 491 U.S. at 453, 109 S.Ct. 2558; *Food Chem. News v. Department of Health and Human Servs.,* 980 F.2d 1468, 1472 (D.C.Cir.1992); Richard O. Levine, Comment, *The Federal Advisory Committee Act,* 10 HARV. J. ON LEGIS. 217, 219, 225 (1973).

In enacting FACA, Congress struck a balance between these concerns, by preserving the advisory committee mechanism for informing policy decisions, while ensuring

> that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature.

*Public Citizen,* 491 U.S. at 446, 109 S.Ct. 2558 (citing 5 U.S.C. app. 2 § 2(b)). Congress aimed, in short, " 'to control the advisory committee process and to open to public scrutiny the manner in which government agencies obtain advice from private individuals.' " *National Anti–Hunger Coalition v. Executive Comm. of the President's Private Sector Survey on Cost Control,* 711 F.2d 1071, 1072 (D.C.Cir.1983) (quoting *Food Chem. News, Inc. v. Davis,* 378 F.Supp. 1048, 1051 (D.D.C.1974)); *accord Public Citizen,* 491 U.S. at 459, 109 S.Ct. 2558; *Animal Legal Defense Fund, Inc. v. Shalala,* 104 F.3d 424, 426 (D.C.Cir. 1997).

In order to achieve these objectives, Congress enacted in FACA a series of requirements governing the creation and operation of bodies falling within the Act's definition of "advisory committee." *See* 5 U.S.C. app. 2 § 3(2). For instance, FACA bars the initiation of new advisory committees absent express authorization by statute or the President, or a formal de-termination by an agency that such establishment would be in the public interest. *See id.* § 9(a). In addition, FACA mandates that advisory committee membership be "fairly balanced in terms of the points of view represented and the functions to be performed," and that a committee's advice reflect its "independent judgment" without improper influences from the appointing authority or special interests. *Id.* § 5(b)(2), (3). Moreover, FACA provides that, once established, an advisory committee must conform its operations to various procedural requirements by, *inter alia,* filing a charter before beginning its operations, *see id.* § 9(c), opening its meetings to the public, *see id.* § 10(a)(1), publishing advance notice of its meetings, *see id.* § 10(a)(2), keeping detailed minutes of its meetings, *see id.* § 10(c), and making available to the public records, drafts, studies, and other documents that were made available to or prepared by or for the committee, *see id.* § 10(b). The Act also charges the General Services Administration ("GSA") with prescribing regulatory guidelines and management controls applicable to advisory committees, and providing such committees with advice and assistance to improve their performance. *See id.* § 7(c). Finally, FACA imposes various oversight and reporting requirements on congressional committees, GSA, and the President, in order to monitor advisory committees and ensure their ongoing usefulness and productivity. *See id.* §§ 5(a), 6(c), 7(b).

Sometimes dubbed the "fifth branch" of Government, *see, e.g.,* Mary Kathryn Palladino, Survey, *Ensuring Coverage, Balance, Openness and Ethical Conduct for Advisory Committee Members under the Federal Advisory Committee Act,* 5 ADMIN. L.J. 231, 231 (1991), advisory committees today remain a fixture in the Nation's Capital. In fiscal year 1997, a total of 36,586 individuals served on 963 committees, *see* U.S. GENERAL ACCOUNTING OFFICE, FEDERAL ADVISORY COMMITTEE ACT: ADVISORY COMMITTEE

Process Appears to Be Working, but Some Concerns Exist, GAO/T–GGD–98–163, at 3 (July 14, 1998) (Statement of L. Nye Stevens), *available at* <http://www.gao.gov>, addressing almost all imaginable topics, from national policy matters to technical or scientific issues. *See generally* U.S. General Services Administration, Federal Advisory Committee Act (FACA) Database, *available at* <http://cm.policyworks.gov/cms> (listing advisory committees by relevant agency). In other words, to this date, the Government continues to draw heavily upon the advisory committee process as a part of its political machinery.

B. *White House Commission on Aviation Safety and Security*

On July 25, 1996, in the wake of the TWA Flight 800 disaster, President Clinton announced his intention to form a committee to study aviation safety and security issues. The White House Commission on Aviation Safety and Security filed a charter on August 21, 1996, and was officially established by Executive Order dated August 22, 1996. *See* Exec. Order No. 13,015, 61 Fed.Reg. 43,937 (1996). This order charged the Commission with recommending a strategy to improve aviation safety and security, both domestically and internationally. *See id.* It provided that the Commission would be chaired by Vice President Gore and supported by the Department of Transportation. *See id.* It further provided that the Commission would consist of no more than twenty-five members to be appointed by the President from the public and private sectors. *See id.* Finally, it provided that the Commission would terminate after six months unless extended by the President. *See id.*

On August 14, 1996, President Clinton invited Cummock, the widow of a Pan Am Flight 103 victim and an advocate for disaster victims and improved airline safety measures, to join the Commission. Additional members included the Vice President, as noted, as well as former Central Intelligence Agency Director John M. Deutch, then Department of Transportation Secretary Federico F. Peña, retired Air Force General John Michael Loh, and other individuals with experience or expertise in aviation safety and security matters.

Once the Commission was established, it immediately began its work, which progressed quickly. On August 22, 1996, the day after the Commission filed its charter, five Commission members held a meeting at which Commissioner Loh presented a document containing draft recommendations. The full Commission then held its first executive session on September 5, 1996, and on September 9, the Commission submitted its initial report to the President, advancing twenty recommendations to enhance aviation security. The Commission continued to meet for several months thereafter, and its final report, containing over fifty recommendations, was delivered to the President on February 12, 1997. The presentation of this report garnered extensive media attention. *See, e.g.,* Matthew L. Wald, *Panel to Recommend Steps for Cutting Air Crash Rate,* N.Y. Times, Feb. 12, 1997, at A1; Robert Davis, *53 Air–Safety Proposals Come Out Today,* USA Today, Feb. 12, 1997, at 3A; Ralph Vartabedian & Elizabeth Shogren, *Tougher Security, Safety Rules for Airlines Proposed,* L.A. Times, Feb. 13, 1997, at A1; J. Lynn Lunsford, *Panel Urges Changes to Improve Air Safety,* Dallas Morning News, Feb. 13, 1997, at 6A. Neither the report nor the accompanying transmittal letter indicated the existence of any dissenting views.

Cummock, alone, dissented from the final report. Her letter of dissent, dated February 19, 1997, was published with the printed version of the final report, which also included an editor's note stating as follows:

This edition contains as Appendix I a dissent by Commissioner Cummock which was transmitted to the Commission one week after the report was voted

on in public session and presented to President Clinton.

During the public session, Commissioner Cummock dissented from three recommendations. The dissent published in this document goes far beyond those registered in public. It presents for the first time material and arguments the other Commissioners did not have an opportunity to consider. However, many of the arguments made in the dissent were considered and rejected by the other members of the Commission.

WHITE HOUSE COMMISSION ON AVIATION SAFETY AND SECURITY, FINAL REPORT TO PRESIDENT CLINTON (Feb. 12, 1997), *reprinted in* Appendix ("App.") 38. The final report included only the narrative portion of Cummock's dissent and excluded the supporting materials that accompanied the dissent. The editor's note to the final report indicated that interested persons could obtain the supporting materials by writing to a specified address. *See id.*

### C. Cummock's Lawsuit

Several months after the Commission was disbanded, Cummock filed suit in District Court, naming Vice President Gore, the Secretary of Transportation, and the Commission as defendants. Cummock alleged, *inter alia,* that the Commission failed to operate in accordance with FACA and the APA, thereby violating her right as a member to participate in the Commission's work. She claimed that, by a series of "procedural irregularities," she was effectively excluded from Commission proceedings. In her view, the Clinton Administration had formed the Commission simply to obtain rubber-stamp endorsement of a predetermined policy agenda, rather than to facilitate genuine deliberations. *See* Brief of Appellant at 14–15. Cummock's allegations fall into four categories, which we summarize briefly as follows.

First, Cummock argues that the Commission violated FACA's charter provision, 5 U.S.C. app. 2 § 9(c), by "tak[ing] ...

action" prior to the filing of its charter on August 21, 1996. The Commission's alleged "action" consisted of a trip led by Vice President Gore to observe aviation operations at Dulles Airport, a presentation regarding Commission activities made by Commissioner Loh at a meeting of the Federal Aviation Administration Security Baseline Work Group, the preparation of draft recommendations, and various other "informational briefings, site visits, and studies" engaged in by Commission members before the Commission's official inception. Brief of Appellant at 5–6.

Second, Cummock claims that the Commission violated FACA's notice provision, 5 U.S.C. app. 2 § 10(a)(2), by failing to publish timely notice of its meetings in the *Federal Register*. According to Cummock, notice was never provided fifteen days in advance of meetings, as required by 41 C.F.R. § 101–6.1015(b)(1), and on one occasion, notice did not appear until after the meeting had occurred.

Third, Cummock contends that the Commission violated the provision of FACA requiring the Commission to make available the records, reports, and other documents made available to it in the course of its deliberations, 5 U.S.C. app. 2 § 10(b). Cummock points to several instances in which she allegedly requested particular information to no avail. For instance, she asked for a copy of an inch-thick briefing paper that she saw Commissioners Gore and Deutch reviewing, but subsequently received only four pages of that document from the Commission's Staff Director. She also requested that she be provided with documents submitted to or received from the Air Transport Association ("ATA"), but allegedly did not receive all such documents. In addition, when she heard mention of a "classified annex," she sought access to those materials, but never received them, despite her security clearance. Lastly, she requested information on the availability of protective breathing equipment for passengers, but received no documents and was assured by

Commission staff that no such information was available, only later to learn that at least one company had submitted a letter concerning its equipment two weeks prior to her request.

Finally, Cummock alleges that the Commission violated the APA, by failing to publish her complete dissent and including a misleading editor's note with the final report. According to Cummock, the Commission did not take up her concerns until immediately before the final report was scheduled to be delivered to the President, thereby delaying her preparation of a dissent. Thus, although Vice President Gore allegedly told her at a public meeting on the morning of February 12, 1997 that the Commission would "make available a place in the report for the full expression of any dissenting views that [she] would like to contribute," Complaint ¶ 40, *reprinted in* App. 21, the report was delivered to the President later that same day without Cummock's dissent. Subsequently, the Commission published only the narrative portion of her dissent, without the supporting materials that she had attached thereto. In addition, the Commission included a misleading editor's note, which inaccurately suggested that Cummock's dissent had presented issues that the full Commission did not have an opportunity to consider, and had been submitted late.

Following the Commission's official termination, Cummock's attorney wrote to the Vice President and the Commission's Staff Director, requesting information relating to the publication of the final report, the basis for the editor's note, and various aspects of Commission operations. Upon receiving no response, counsel reiterated this request in another letter. Although receipt of these letters was acknowledged by the Department of Transportation's Office of General Counsel, no response was ever received.

Subsequently, on May 8, 1997, Cummock filed this lawsuit, alleging multiple violations of FACA and the APA. As relief, Cummock sought an injunction prohibiting the final report from being published, distributed, or used without her "complete dissent," requiring the final report to be amended to correct misstatements in the editor's note, requiring all Commission documents and records to be made available to Cummock, requiring that Cummock be given an opportunity to amend her dissent, and prohibiting distribution of the final report as a FACA advisory committee report. *See* Complaint at 27, *reprinted in* App. 32. Cummock also sought a declaration that "the Commission has operated in violation of FACA and GSA implementing regulations and that the actions taken by the Commission to date are *ultra vires.*" *Id.* at 28, *reprinted in* App. 33.

In July 1997, the Government filed a motion to dismiss Cummock's complaint for lack of standing or failure to state a claim upon which relief can be granted. According to the Government, Cummock was subsequently permitted to review at least some non-classified Commission documents, and was given copies of most of the documents she requested. "Those documents not produced were determined, upon initial review, to include information that might be exempt from disclosure under the Freedom of Information Act [FOIA]." Brief for the Appellees at 20–21.

On June 15, 1998, the District Court dismissed all of Cummock's claims. *See Cummock v. Gore*, Civ. No. 97–981 (D.D.C. June 15, 1998) (Memorandum), *reprinted in* App. 228. In sum, the trial court held that Cummock lacked a judicially enforceable right to participate in Commission activities, that her request for documents was untimely, and that she lacked standing to challenge the Commission's notice of its meetings as inadequate. This appeal followed.

## II. ANALYSIS

FACA is not new legislation, having been enacted more than a quarter of a century ago. There has been considerable

litigation over the statute's meaning, so there is a wealth of case law to guide us in this case. For example, in recent years, this court has considered and decided whether a given group constitutes an advisory committee for the purposes of FACA, *see, e.g., Sofamor Danek Group, Inc. v. Gaus,* 61 F.3d 929 (D.C.Cir.1995), when a member of the public has standing to sue under FACA, *see, e.g., Byrd v. EPA,* 174 F.3d 239 (D.C.Cir.1999), and what are the appropriate remedies for violations of FACA, *see, e.g., California Forestry Ass'n v. United States Forest Serv.,* 102 F.3d 609 (D.C.Cir.1996). Although the instant case presents a unique factual scenario, it is clear that the issues posed here are readily resolved by reference to the terms of the statute, the supporting legislative history, and well established precedent.

The Government seeks to cast Cummock as essentially a disgruntled Commission member, who failed to convince her fellow Commissioners of her view and then pursued this lawsuit as an alternative avenue of recourse. The District Court agreed with the Government that Cummock had no valid legal claims and dismissed Cummock's complaint in its entirety. Our review of the District Court's ruling is *de novo, see Systems Council EM–3 v. AT&T,* 159 F.3d 1376, 1378 (D.C.Cir.1998). We reject the Government's self-serving characterizations. In point of fact, Cummock has raised a viable claim under FACA and her lawsuit was improperly dismissed. Accordingly, we reverse.

### A.

Our first task is to explain what is truly at issue here. In the District Court, Cummock alleged a slew of FACA violations and sought a broad range of injunctive and declaratory relief. It is apparent on appeal, however, that Cummock's position turns principally on her lack of access to information relied upon by the Commission, and her concomitant inability to prepare an informed dissent. To be sure, Cummock continues to argue—at least in her briefs—that the Commission violated FACA's charter and notice provisions, as well as the APA. *See* Brief of Appellant at 17–20, 35–37. However, she has also made it quite clear that "[s]he does not seek to enjoin use of the report, but only a declaration that FACA was violated, and an opportunity to obtain relevant information and to modify, correct, and publish her complete dissent." Reply Brief of Appellant at 16. In other words, she seeks relief solely in connection with her claim under § 10(b) of FACA.

Cummock's counsel conceded as much at oral argument, stating that what Cummock desires, in a nutshell, is the opportunity to obtain and review all documents relied upon by the Commission in formulating its recommendations, and to amend her dissent if necessary to ensure a complete and fully informed expression of her objections. Under these circumstances, we find that the only claim before us warranting our attention is Cummock's assertion that the Commission denied her access to relevant documents, and thereby thwarted her dissenting voice.

■ Cummock's claim is rooted in § 10(b) of FACA, which provides as follows:

> Subject to [FOIA], the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist.

This provision "affirmatively obligates the Government to provide access to the identified materials." *Food Chem. News,* 980 F.2d at 1472. In other words, the Government must make such materials available for public inspection and copying, even in the absence of a particular request, unless "the agency reasonably claims [the materi-

als] to be exempt from disclosure pursuant to FOIA." *Id.* at 1469. According to Cummock, the Commission violated § 10(b) by failing to make the required information available to her, even when she specifically requested it in connection with her work on the Commission. She identifies particular documents to which she was allegedly entitled (*i.e.*, the inch-thick briefing paper, the ATA correspondence, the classified annex, and the information on protective breathing equipment), adding that she "is unable at this point to say how much she has not seen." Brief of Appellant at 22. Cummock argues, in short, that the Commission's FACA violations interfered with her right and responsibility to participate in its deliberations, and compromised her ability to prepare a fully informed dissent.

## B.

▆▆▆ Before proceeding to the merits of Cummock's claim, we must confirm our jurisdiction to hear this dispute. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 1010, 140 L.Ed.2d 210 (1998). In particular, we must assure ourselves of Cummock's standing to sue for a violation of FACA based on the Commission's failure to supply her with the information required under the Act. The constitutional standing requirements are familiar: Cummock must show that she has suffered a particularized injury to a cognizable interest, her injury is fairly traceable to the Government's actions, and a favorable judicial ruling will likely redress her injury. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Cummock readily satisfies the standing requirements in this case. First, she suffered an injury under FACA insofar as the Commission denied her requests for information that it was required to produce. *See Public Citizen,* 491 U.S. at 449, 109 S.Ct. 2558; *Byrd,* 174 F.3d 239, 242–43. Second, her injury was directly caused by

the Commission's alleged violation of FACA. Finally, her injury is redressable by the relief she seeks—namely, access to documents to which she is entitled under FACA and an opportunity to amend her dissent to reflect any changes stemming from a review of those materials. *See NRDC,* 147 F.3d at 1023 ("[T]he appellees plainly have standing to request injunctive relief directing the [agency] to make Committee documents and records available to the full extent permitted by FACA....").

We turn next to the question of whether Cummock possesses an enforceable right under FACA. In the Government's view, Cummock possesses no cause of action here. The Government contends that it does not matter that Cummock was a Commission member, because her claim of entitlement to documents represents merely an "internal dispute[ ] among committee members," for which there are no meaningful standards to guide judicial review. Brief for the Appellees at 15. Thus, the Government argues that Cummock, like any member of the public, had only a limited right, while the Commission was in existence, to obtain information pursuant to § 10(b) of FACA. According to the Government, even during the course of Commission deliberations, Cummock had no right under FACA to obtain documents that were exempt from public disclosure under FOIA. Furthermore, because the Commission no longer exists, the Government asserts that Cummock must seek Commission documents via a properly filed FOIA request, which the Government "stands ready to process." Brief for the Appellees at 20. Under this scenario, if the Government refuses to release certain information, Cummock would then be required to file suit under FOIA, challenging that decision.

▆▆▆ In short, the Government would have us adopt the broad principle that a duly appointed advisory committee member, who has all necessary security clearances, has no rights beyond those enjoyed by the public-at-large. Under this view—

from which Government counsel stubbornly refused to budge at oral argument—advisory committee membership accords no real right to participate in committee proceedings. Indeed, counsel went so far as to suggest that the Government could, without violating FACA, appoint an individual to an advisory committee and then wall that individual off from the committee's operations, rendering membership essentially meaningless. The Government's position is rather astonishing, and we reject it.

It would be quite absurd for us to hold that a FACA advisory committee—a public deliberative body that is subject to precise statutory mandates designed to ensure openness and fair deliberations—may simply exclude unpopular viewpoints from participation. Yet, according to the Government, this outcome is reasonable, because Congress, in drafting FACA, said nothing about committee members obtaining rights of access beyond those of the public. We are told that sanctions short of judicial review will flow to committees that operate to exclude particular members: an unhappy member can refuse to sign the committee's report, and FACA's sunshine provisions will ensure that such irregularities are exposed to the public. In the Government's opinion, however, appointed committee members possess no particular rights of participation, and may even be denied access to information underscoring the committee's recommendations.

We flatly reject the Government's view, for it is simply untenable in light of the stated purposes of FACA. In passing this legislation, Congress emphasized the need "to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee," *National Anti-Hunger Coalition,* 711 F.2d at 1074 n. 2, and to protect against "the risk that governmental officials would be unduly influenced by industry leaders," *Public Citizen v. National Advisory Committee on Microbiological Criteria for Foods,* 886 F.2d

419, 437 (D.C.Cir.1989) (Edwards, J., concurring in part and dissenting in part); *see also Cargill, Inc. v. United States,* 173 F.3d 323, 328–30 (5th Cir.1999) ("FACA is designed to ensure that advisory committees are fairly constituted and properly monitored so that they will provide sound advice."). These concerns were expressly embodied in the provisions of FACA requiring that committee membership be fairly balanced in terms of viewpoints and functions, and that committees exercise independent judgment free from improper influences. *See* 5 U.S.C. app. 2 § 5(b)(2), (3). Yet, an interpretation of FACA that permitted a given advisory committee to exclude a disfavored member would fly in the face of the principle established by these requirements: a committee might be nominally balanced, because an individual was appointed to represent certain views, but effectively unbalanced, because that individual was precluded from meaningful participation. Moreover, contrary to the Government's assertions at oral argument, FACA's sunshine provisions, while a central feature of the Act, are not a substitute for the Act's provisions requiring balance and independence.

In *Food Chemical News,* we found that, in order to give meaning to FACA's sunshine provisions, § 10(b) must be read to impose an affirmative obligation on the Government to, "whenever practicable, [provide] access to the relevant materials before or at the meeting at which the materials are used and discussed." 980 F.2d at 1472. Likewise, in order to give meaning to FACA's fair balance and independent judgment provisions, the Act must be read to confer on a committee member the right to fully participate in the work of the committee to which he or she is appointed. Any other reading would nullify Congress's express intent.

We find the Government's position somewhat disingenuous, moreover, as committee membership is manifestly not meaningless in the "real world" of Washington policy making. Appointment to an

advisory body is often coveted and highly esteemed, and the benefits flow both ways: while the individual member gains "recognition and even prestige," the Government obtains valuable advice and political legitimacy with respect to its policy decisions. *Association of Amer. Physicians and Surgeons, Inc. v. Clinton*, 997 F.2d 898, 914 (D.C.Cir.1993); *see also* Jay S. Bybee, *Advising the President: Separation of Powers and the Federal Advisory Committee Act*, 104 YALE L.J. 51, 58–59 (1994) ("The government ... uses advisory committees to legitimize agency viewpoints. An agency decisionmaker may have reached a tentative or even a firm conclusion about a particular matter, and may look to an advisory committee to validate that conclusion. Politically, the agency's decision will not be salable without some outside, 'neutral' support.") (footnote omitted); *id.* at 59 ("[P]residential advisory committees may serve purely political ends, as vehicles for communicating with Congress and the people, building support for proposals, or masking the government's unwillingness to act."). Thus, we have observed that:

> When the executive branch endorses [a committee's] advice and seeks to promote the policy course suggested by the committee, the executive branch draws upon the committee's political legitimacy. Congress' effort to ensure that these committees are balanced in terms of viewpoint recognizes their usefulness for political (and patronage) purposes.

*Association of Amer. Physicians and Surgeons*, 997 F.2d at 914. Given these realities, it is apparent that committee membership bestows both rights and obligations beyond those given to members of the general public.

■ In any event, the Government does not dispute that committee members have *at least* the same rights under FACA as the public. Although we disagree with the Government's position that the rights of a committee member extend no further than the rights of a non-member, even taking only this limited view, the Government's concession is significant. Because there is no question under our precedent that members of the public possess enforceable rights to obtain information under FACA, *see Food Chem. News*, 980 F.2d at 1472, it follows *a fortiori* that committee members have at least these same rights. And we have also made it clear that FACA rights are enforceable even after an advisory committee has been disbanded. *See, e.g., Byrd*, 174 F.3d 239, 243–44 (rejecting argument that plaintiff's injury was not redressable where panel had already completed its work and been disbanded).

The Government's concession that committee members have *at least* the same rights under FACA as the public goes to the heart of Cummock's document request. Cummock clearly possesses an enforceable right to information under FACA, because any member of the public possesses such a right. Moreover, Cummock possesses an even greater right than a member of the public, because, as a Commission member, she is entitled to fully participate in its deliberations. Thus, provided that Cummock was granted the requisite security clearance, the Commission could not deny her access to information that it reviewed and relied upon in formulating its recommendations—even if, for instance, that information might have been withheld from the public pursuant to a FOIA exemption.

■ For the purposes of this case, two avenues of relief follow from our conclusion that Cummock has an enforceable right under FACA. First, to the extent that Cummock seeks information that was made available to the Commission during the course of its deliberative process and without which her ability to fully and adequately participate in that process was impaired, she is entitled to review such materials. On this score, no one seems to know precisely what Cummock still needs. At oral argument, Cummock's counsel was unable to pinpoint what documents Cummock is entitled to receive to which the Government has yet to provide her access. Government counsel, while indicating that

Cummock has received certain documents, was likewise unable to assure us that she has obtained everything that she might be entitled to review. Therefore, on remand, the District Court must engage in the necessary discovery and fact finding to determine whether any additional materials fall within the parameters of information to which Cummock is entitled. *Cf. Animal Legal Defense Fund,* 104 F.3d at 431 (remanding to district court, after finding that committee was subject to FACA, "so that the district court may determine whether there are documents to which the appellants may obtain access under FACA and whether other injunctive relief should issue"); *California Forestry Ass'n,* 102 F.3d at 613 ("We are unable to determine the propriety of injunctive relief at the summary judgment stage because the district court has yet to make factual findings.").

Second, assuming that Cummock is entitled to review certain Commission documents to which she has heretofore been denied access, she must also be given an opportunity to amend and publish a dissent incorporating her fully enlightened views. We note that there is no dispute here over Cummock's right to have her dissent published with the final report. The Government gave her that right by publishing her dissent initially, so the question is no longer at issue. Because the Commission's FACA violations frustrated Cummock's ability to prepare a complete and informed dissent, the Government must allow Cummock to revise that dissent if she wishes to do so. Furthermore, because the final report is still widely available, including on the internet, *see* <http: //www.aviationcommission.dot.gov>, and may still be in use by agency decision makers, the Government must publish and distribute Cummock's revised dissent in the same places as it originally circulated the final report and dissent. Finally, the District Court should consider whether, in light of any amendments that are made to Cummock's dissent, modification of the editor's note would be appropriate.

### III. CONCLUSION

For the above reasons, we reverse the decision of the District Court and remand the matter for further proceedings consistent with this opinion.

*So ordered.*

ROGERS, Circuit Judge, concurring: I write separately to clarify two points.

First, notwithstanding the broad language in the court's opinion, *see* Opinion at 291–92, 293, the court is not foreclosing the government from showing that it would not be "practicable" to disclose information to all members of a committee established under the Federal Advisory Committee Act. *Cf. Food Chem. News v. Department of Health and Human Servs.,* 980 F.2d 1468, 1469 (D.C.Cir.1992). Although the court concludes that members of a FACA committee are entitled to "fully participate" in committee deliberations, *see* Opinion at 293, the court has not considered, and expresses no view about, whether "full" participation necessarily entails an equal opportunity to participate at all times. For example, a FACA committee might plausibly claim that it may consider classified information even if such information cannot be made available to all of its members for want of a security clearance or "need to know." Exec. Order 12,958, § 4.2(a)(3), 60 Fed.Reg. 19,825 (1995). However, whether denial of access to classified or sensitive information would constitute an actionable denial of "full" participatory rights is not before the court (but may arise on remand) because the government has not identified any reason to treat Cummock on less-than-equal footing with other committee members. She asserts that she had the necessary security clearance and the government does not contest that assertion. *See* Appellee's Brief at 20 n.8. To the extent the government maintains there is still a "need to know" threshold requirement before classified informa-

294

tion can be disclosed, *see id.* (citing Exec. Order 12,958), the court's holding that Cummock has a right to participate fully in the committee's deliberations, which includes a cause of action to obtain the same information provided other members, appears to satisfy the need-to-know requirement, although the issue could be explored as necessary by the district court on remand.

Second, following from the court's holding that there is a cause of action under FACA for a committee member to obtain information considered during committee deliberations is the question of what a member may do with that information, i.e., whether FACA allows additional equitable remedies entitling Cummock to amend her dissent or delete the editor's note. Broad remedies may be available. *Cf. California Forestry Ass'n v. United States Forest Serv.,* 102 F.3d 609 (D.C.Cir.1996); *see also Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and its progeny, *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 18, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Neither party has fully briefed the question of remedies, the district court did not address it, nor has this court previously considered the scope of remedies available to committee members who, after a committee has disbanded and released its final report, challenge the manner in which the committee deliberated. Still, in view of the publication of Cummock's dissent, her right to participate fully would be seriously diminished were she unable to correct her dissent in light of information previously wrongfully withheld from her and to have it published in corrected form. *See* Opinion at 293. Given congressional intent to avoid the wasteful expenditure of public money and biased proposals, *see Public Citizen v. United States Dept. of Justice,* 491 U.S. 440, 453, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989), in part by requiring committee membership to be "fairly balanced" and the advice to be the result of

the committee's "independent judgment," *see* 5 U.S.C. app. 2 § 5(b)(2), (3), the court reasonably concludes that such a remedy reflects congressional intent. *See Transamerica Mortgage Advisors, Inc.,* 444 U.S. at 25, 100 S.Ct. 242. Contrary to the government's suggestion, *see* Appellee's Brief at 15–17, such relief does not represent judicial intrusion in intra-committee disputes; the committee has already decided to publish Cummock's dissent. But, in view of the posture of the case on appeal, the district court retains leeway to consider the scope of its remedial authority in light of arguments that the parties may advance on remand. *See, e.g.,* Opinion at 293.