**HEARTWOOD, INC., et al., Plaintiffs,**

v.

**UNITED STATES FOREST SERVICE, Defendant.**

**No. Civ.A. 02–1898(RWR).**

United States District Court, District of Columbia.

April 21, 2006.

Matthew G. Kenna, Western Environmental Law Center, Durango, CO, James B. Dougherty, Law Office of J.B. Dougherty, Washington, DC, for Plaintiffs.

Oliver W. McDaniel, U.S. Attorney's Office for the District of Columbia, Civil Division, Washington, DC, for Defendant.

## MEMORANDUM OPINION

ROBERTS, District Judge.

Plaintiffs Mark Donham and Heartwood, Inc. sued the United States Forest Service ("USFS") to compel the release of draft chapters of an ecological assessment under the Freedom of Information Act ("FOIA") and the Federal Advisory Committee Act ("FACA") after the USFS denied their initial request for the drafts. The USFS moved for summary judgment on both the FOIA and the FACA requests. In response, plaintiffs Heartwood and Donham filed a cross-motion for summary judgment. Because the drafts were developed by the Hoosier–Shawnee Ecological Analysis Committee ("HSEAC"), an advisory committee subject to the FACA, and are not exempted from the FOIA, plaintiffs' cross-motion for summary judgment will be granted, and defendant's motion for summary judgment will be denied.

## BACKGROUND

Donham is a full-time employee of Heartwood, a non-profit corporation that seeks to protect forests in the Central Hardwood region of the United States. On behalf of Heartwood, Donham filed a FOIA request with the USFS, seeking copies of the "individual draft reports" of the ecological assessment for the area encompassing the Shawnee and Hoosier National Forests that the HSEAC had prepared for the USFS. (Def.'s Summ. J. Mot., Morgan Decl. ¶ 5.) An ecological assessment is a "scientific assessment of the characteristic composition, structure and processes of ecosystems." (Am. Compl. at 3.) An ecological assessment is not a policy decision, a draft of a policy document, or a policy recommendation. (Pls.' Mot. to Expedite, Ex. A at 5, 8, 9.)

The USFS initiated the ecological assessment of the Shawnee and Hoosier National Forests in order "to gain an understanding of current conditions and trends regarding the land, resources, and people [in the] relevant historical context." (Pls.' Mot. to Expedite, Ex. A at 8.) "A charter for the Hoosier–Shawnee Ecological Assessment, established by the supervisors of the Hoosier and Shawnee National Forests, identified a team to conduct the assessment as well as tentative questions to answer." (*Id.*, Ex. A at 9; *see also* Pls.' Summ. J. Mot., Ex. A.) This team, the HSEAC, was comprised of scientists, most of whom were not employees of the USFS or the federal government. (Pls.' Summ. J. Mot. at 1; Def.'s Summ. J. Mot., Morgan Decl. ¶ 6.) The USFS entered into agreements with the scientists to produce reports summarizing existing data. (Def.'s Summ. J. Mot., Reynolds Decl. ¶ 6, Thompson Decl. ¶ 5.) Among those on the committee were individuals from Purdue University, Southern Illinois University, Indiana Department of Natural Resources, The Nature Conservancy of Indiana and the North Central Experiment Station. (Am. Compl. at 3.)

The USFS asked the HSEAC to produce draft reports "summarizing [the best

available] scientific information concerning the ecological conditions of the region encompassing the Hoosier and Shawnee." (Def.'s Summ. J. Mot., Reynolds Decl. ¶ 7.) Although each scientist was to work independently or in a small group, the HSEAC had two meetings with the USFS at which all of the scientists provided information on existing data collections that would be used in the assessment. (*Id.* ¶ 8.) The group discussed the topics and outlined the report. (*Id.*) The USFS told the scientists not to make recommendations in their reports (*id.*), and that "the results of the ecological analysis and population viability assessments, and other analysis ... will be examined to determine how, or if, the desired future conditions outlined in the existing forest plans need to be modified." (Pls.' Summ. J. Mot., Ex. A at 2.)

The requested records consist of six documents containing 282 pages. (Def.'s Summ. J. Mot., Morgan Decl. ¶ 10.) The first document, a draft of a chapter submitted by five scientists unaffiliated with the USFS, summarizes information on the diversity of aquatic life in the Shawnee and Hoosier Forests. (*Id.* ¶ 11.) The second document was written by two scientists unaffiliated with the USFS and it summarizes information on the region's freshwater resources. (*Id.* ¶ 12.) A USFS scientist wrote the third report, summarizing the region's soil conditions. (*Id.* ¶ 13.) The fourth document reports on terrestrial animal species in the region, and was written by a scientist at a federal agency, a scientist unaffiliated with the federal government and two graduate students. (*Id.* ¶ 14.) The fifth document, authored by

two scientists unaffiliated with the federal government, reports on the historic and prehistoric vegetative conditions of the region. (*Id.* ¶ 15.) The sixth document is a draft of a sub-chapter on native tree diseases written by a USFS scientist. (*Id.* ¶ 16.) Each of these requested documents is in draft form and the USFS does not consider them final documents. (*Id.* ¶ 11–16.)

The draft reports of the HSEAC eventually became a final publication, "The Hoosier Shawnee Ecological Assessment." (Pls.' Mot. to Expedite, Ex. A.) The final assessment notes that the "information presented provides a context for land and resource management planning on the Hoosier and Shawnee National Forests," but that "the assessment makes no management decisions or recommendations." [1] (*Id.*, Ex. A at 3, 5.) This report, a "scientific assessment of the characteristic composition, structure, and processes of ecosystems in the southern one-third of Illinois and Indiana and a small part of western Kentucky[,] ... focuses on information most likely to be relevant to land management planning on the Hoosier and Shawnee National Forests." (*Id.*, Ex. A at 8.) The USFS will use this final report to develop its Forest Plans and an Environmental Impact Statement for the Hoosier and Shawnee Forests. (Def.'s Summ. J. Mot., Reynolds Decl. ¶ 13.)

The USFS denied plaintiffs' FOIA request on the grounds that the analyses in their draft form constituted protected material under the deliberative process privilege of the FOIA's Exemption 5. [2] (Def.'s

---

1. The report repeats that although "[r]egional assessments provide valuable information for land management planning and may discuss consequences of various management actions ... they make no land management decisions or even recommendations" (Pls.' Mot. to Expedite, Ex. A at 8), and that the report "does not make management decisions or even management recommendations, nor does it provide any formal analyses of possible management actions." (*Id.*, Ex. A at 9.)

2. Exemption 5 of the FOIA allows agencies to withhold deliberative process materials from

Summ. J. Mot. at 2.) Plaintiffs appealed the USFS's decision, but were denied again based on Exemption 5 of the FOIA. Heartwood[3] then filed this action, and the parties filed cross-motions for summary judgment.

### DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Waterhouse v. District of Columbia,* 298 F.3d 989, 991 (D.C.Cir. 2002). The record must be viewed in the light most favorable to the nonmoving party. *See Waterhouse,* 298 F.3d at 991.

### I. FEDERAL ADVISORY COMMITTEE ACT

■ Congress passed the FACA in part to ensure that the public could remain apprised of the existence, activities and cost of advisory committees. *See Public Citizen v. Dep't of Justice,* 491 U.S. 440, 446, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (citing 5 U.S.C. app. II § 2(b) (2000)). Enacted in 1972 as a response to the numerous committees, boards, commissions and other groups that had been established to advise officers and agencies in the executive branch of the federal government, one goal of the Act was to prevent wasteful expenditure of public funds. *See Public Citizen,* 491 U.S. at 453, 109 S.Ct. 2558. Additionally, Congress sought to counter the fear that committees would be dominated by representatives of industry and other special interest groups seeking

to advance their own agendas. *See Cummock v. Gore,* 180 F.3d 282, 284 (D.C.Cir. 1999) (citing H.R.Rep. No. 92–1017 (1972)).

The FACA provides, in part, that:

> Subject to [the FOIA], the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist.

5 U.S.C. app. II § 10(b). Under the FACA, advisory committees must also "file a charter; announce their upcoming meetings in the Federal Register; hold their meetings in public; and keep detailed minutes of each meeting." *In re Cheney,* 406 F.3d 723, 727 (D.C.Cir.2005) (citing 5 U.S.C. app. II § 9(c); §§ 10(a)(1), (2), (b) & (c); § 11). Finally, the "committee must 'be fairly balanced in terms of the points of view represented' and may 'not be inappropriately influenced by the appointing authority or by any special interest.' " *Id.* (quoting 5 U.S.C. app. II §§ 5(b)(2), (3) & (c)).

The FACA defines an advisory committee as "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . which is . . . established or utilized by one or more agencies in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." 5 U.S.C. app. II § 3(2).

---

production under a FOIA request. 5 U.S.C. § 552(b)(5) (2000).

**3.** The complaint names Heartwood, Inc. and Donham as plaintiffs. For ease of reference, the plaintiffs will be referred to as Heartwood.

■ The Supreme Court has given a narrow interpretation to the words "established" and "utilized." An advisory panel is established when it has been formed by a government agency, and utilized if it is "amenable to ... strict management by agency officials." *Public Citizen,* 491 U.S. at 457–58, 109 S.Ct. 2558; *see also Food Chemical News v. Young,* 900 F.2d 328, 332–33 (D.C.Cir.1990) (finding that a committee is "established" when it is "a government formed advisory committee"). In *Food Chemical News,* the court found that a panel advising the Federation of American Societies for Experimental Biologies, which in turn advised the Food and Drug Administration on food safety, was not an advisory committee subject to the FACA because the panel was neither established by the FDA nor "amenable to [any] management by [FDA] officials." *Id.* at 333 (quoting *Public Citizen,* 491 U.S. at 457–458, 109 S.Ct. 2558); *see also Byrd v. Envtl. Prot. Agency,* 174 F.3d 239, 246 (D.C.Cir.1999) (finding that a committee providing recommendations to the Eastern Research Group which had contracted to provide recommendations to the Environmental Protection Agency, was not established by the EPA and therefore not an advisory committee subject to the FACA, even though the EPA conceived of the need for the committee).

Unlike the committees in *Public Citizen, Food Chemical News* and *Byrd,* which the federal agencies did not directly convene but were aided by, the USFS formed the HSEAC. (Pls.' Summ. J. Mot., Ex. A.) The USFS identified the members of the team, contracted directly with them for their services, paid them, and provided them with initial questions to answer. (*Id.*) The USFS established the committee within the meaning of the FACA.

■ Advisory panels that support decision makers with data, and not policy advice or recommendations, can be considered advisory committees under the FACA. *See Northwest Forest Res. Council v. Espy,* 846 F.Supp. 1009, 1013 (D.D.C. 1994) (citing *Public Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods,* 886 F.2d 419 (D.C.Cir.1989) (applying the FACA to a committee established by the Secretary of Agriculture which provided to the Secretaries of Agriculture and Health and Human Services primarily scientific and technical advice on developing microbiological criteria for food safety)). When a committee is established to provide expert summaries or interpretation of technical data, their reports can be "in the interest of obtaining advice or recommendations for ... one or more agencies." 5 U.S.C. app. II § 3(2); *see also Cal. Forestry Ass'n v. U.S. Forest Serv.,* 102 F.3d 609, 610–11 (D.C.Cir.1996) (addressing the issue of whether the committee was subject to the FACA if the report was intended primarily for Congress, and only subsequently used by the agency). In *California Forestry Association,* the D.C. Circuit found that a committee established by the USFS to create a scientific review of the remaining old growth of the Sierra Nevada national forests was subject to the FACA's requirements, noting that the factual review is "an essential element of the Forest Service's long-term plan for ecosystem management" and that it was being used to draft an environmental impact statement. *Id.* at 611–12. Nothing supports the assertion that the "FACA should not apply to 'advisory committees' consisting only of technicians who supply the decisions-makers with data." *Northwest Forest Res. Council v. Espy,* 846 F.Supp. 1009, 1013 (D.D.C.1994) (noting that the committee at issue did render policy advice to the President, but not finding that fact dispositive when holding that the committee was subject to the FACA's requirements).

The USFS expressly asked the HSEAC not to provide any recommendations in their draft reports, and the final publication emphasizes that it "makes no management decisions or recommendations." (Pls.' Mot. to Expedite, Ex. A at 5.) The final assessment does "provide[ ] a context for land and resource management planning on the Hoosier and Shawnee National Forests." (*Id.* at 3.) Even though HSEAC provided the USFS with only narrative summaries of scientific information, and made no policy recommendations, the HSEAC drafts and the final assessment provide the framework, context and information that the USFS will rely on in making policy decisions. The USFS is required to revise the Forest Plans for the Shawnee and Hoosier Forests, which "establishes the management policies and practices," and submit an environmental impact statement. (Def.'s Summ. J. Mot., Reynolds Decl. ¶ 3.) The USFS initiated the ecological assessment "[i]n order to develop the future Forest Plans and draft [environmental impact statement] for the Hoosier and Shawnee." (*Id.* ¶ 5, 6; *see also* Pls.' Mot. to Expedite, Ex. A at 8 (stating that the USFS will use the ecological assessment to inform, modify, and develop its forests plans, and to create an environmental impact statement).) Because the USFS has contemplated that the final ecological assessment would play a leading role in developing the forest plan for the Hoosier and Shawnee Forests, the HSEAC provided information "in the interest of obtaining advice or recommendations for . . . one or more agencies" and is subject to the FACA's requirements. 5 U.S.C. app. II § 3(2).

The HSEAC also is not exempted from the FACA under the exceptions provided in the Code of Federal Regulations. Committees excepted from the FACA requirements include:

(e) Groups assembled to provide individual advice. Any group that meets with a Federal official(s), including a public meeting, where advice is sought from the attendees on an individual basis and not from the group as a whole; [and] (f) Groups assembled to exchange facts or information. Any group that meets with a Federal official(s) for the purpose of exchanging facts or information;

41 C.F.R. § 102–3.40(e), (f) (2005).

Although the scientists and parties involved in HSEAC drafted their summaries in sub-groups or individually, and not as one large group, the USFS considered the scientists working on HSEAC to be a team. (*See, e.g.,* Pls.' Summ. J. Mot., Ex. A at 2–3 (referring to the HSEAC as a "team").) The HSEAC met twice as a group to discuss the existing data available and to outline the report. (Def.'s Summ. J. Mot., Reynolds Decl. ¶ 8.) The HSEAC was assembled for the single purpose of drafting the ecological assessment to inform the USFS's policy-making. *See, e.g., Nader v. Baroody,* 396 F.Supp. 1231, 1234 (D.D.C.1975) (holding that the purpose and "narrow focus" of a committee is a factor in evaluating whether a group is an advisory committee within the meaning of the FACA). The HSEAC is not the type of ad hoc, individualized group that 41 C.F.R. § 102–3.40(e) was designed to exempt from the FACA.

The HSEAC also is not a group that was assembled to *exchange* facts or information. If the President or an agency seeks to "provide[ ] a mechanism and sounding board to test the pulse of the country by conferring directly or indirectly with a widely disparate special interest groups" and encourage an "exchange of views," the resulting meetings are not subjected to the requirements of the FACA. *Nader,* 396 F.Supp. at 1232, 1234. HSEAC, however, did not involve the ex-

change of information between the USFS and the outside scientists. Rather, the scientists provided the USFS with the narrative summaries in a one-way transfer of information. (*See* Pls.' Summ. J. Mot., Ex. A at 1–2.) Nothing suggests that the HSEAC functioned to "increase the flow of information between" private groups and the executive branch like the informal meetings that 41 C.F.R. § 102–3.40(f) exempts from the FACA.

Because the HSEAC is an advisory committee within the meaning of the FACA, the USFS must release the draft reports Heartwood requested, unless the drafts are otherwise protected by the FOIA.

## II. FREEDOM OF INFORMATION ACT

■ The FACA requires disclosure of an advisory committee's records "subject to section 552 of title 5 of the United States Code." 5 U.S.C. app. II § 10(b). All materials prepared by an advisory committee under the FACA must be available to the public unless they are exempt from the FOIA. *Food Chemical News v. Dep't of Health & Human Servs.*, 980 F.2d 1468, 1469 (D.C.Cir.1992). Exemption 5 of the FOIA provides that an agency is not required to disclose "inter-agency or intra-agency memorandums or letters" concerning its deliberative process. 5 U.S.C. § 552(b)(5).[4] This exemption is not available to documents revealing an advisory committee's deliberative process because

the exemption applies only to agencies. *Wolfe v. Weinberger*, 403 F.Supp. 238, 242 (D.D.C.1975). "[A]n advisory committee cannot have a 'double identity' as an agency and thus cannot invoke [Exemption 5]." *Id.; see also Gates v. Schlesinger*, 366 F.Supp. 797 (D.D.C.1973).[5] To make Exemption 5 available to an advisory committee "would be in clear contravention of the purpose of the [FACA]." *Wolfe*, 403 F.Supp. at 242–43 (noting also that "to allow the [advisory committee] to avail itself of the (b)(5) exemption ... would be tantamount to burying the type of deliberations which the [FACA] sought to bring to the light of day").

■ Documents produced by an advisory committee that are "relied upon by the *agency* in the course of decision-making," however, could be considered an integral part of the deliberative process and entitled to protection under Exemption 5. *Id.* at 243 [6] (emphasis added). Information qualifies for Exemption 5's privilege if the information is predecisional and deliberative. *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 39 (D.C.Cir.2002). The purpose of this exemption is to "protect[ ] the consultative functions of government by maintaining the confidentiality of advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Jordan v. Dep't of Justice*, 591 F.2d 753, 772 (D.C.Cir.1978)

---

**4.** The statute excludes "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This includes documents protected by the attorney-client privilege, work-product privilege and the executive deliberative process privilege. *See Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 86–87, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), *superceded on other grounds by* Pub.L. No. 93–502.

**5.** *Gates* found significant that the FACA contains separate definitions of an "advisory committee" and "agency," thus supporting the proposition that an advisory committee is not an agency. *Gates*, 366 F.Supp. at 798–99.

**6.** Exempt agency documents that the advisory committee used in its own deliberations would also continue to receive the protection of the FOIA exception. *Wolfe*, 403 F.Supp. at 243.

(internal quotation marks omitted), *overruled in part on other grounds, Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051 (D.C.Cir.1981).

█ A document is considered "deliberative" when "it reflects the give-and-take of the consultative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980). The exception is designed to shield the "process by which governmental decisions and policies are formulated." *Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1433 (D.C.Cir.1992). Documents that "reflect the personal opinions of the writer rather than the policy of the agency" or that "would inaccurately reflect or prematurely disclose the views of the agency," are considered deliberative. *Coastal States Gas Corp.*, 617 F.2d at 866. The key inquiry is whether disclosure is likely "to stifle honest and frank communication within the agency"; if so, the information is protected. *Id.*

█ "As a general proposition Exemption 5 does not shield from disclosure 'purely factual, investigative matters,' as opposed to 'materials reflecting deliberative or policy-making processes.'" *Washington Research Project, Inc. v. Dep't of Health, Ed. & Welfare*, 504 F.2d 238, 249 (D.C.Cir.1974). However, "in some instances, 'the disclosure of even purely factual material may so expose the deliberative process within an agency' that the material is appropriately held privileged." *Petroleum Info. Corp.*, 976 F.2d at 1434 (quoting *Mead Data Central, Inc. v. Dep't of Air Force*, 566 F.2d 242, 256 (D.C.Cir. 1977)). Factual material may also be exempt "if it is inextricable without compromise of the deliberative process ... even though the facts themselves are elsewhere

on the public record." *Washington Research Project, Inc.*, 504 F.2d at 249. A document containing "opinions or recommendations regarding facts" that also reveals "the decision-making process itself" would be protected from disclosure under Exemption 5. *Nat'l Wildlife Federation v. USFS*, 861 F.2d 1114, 1118 (9th Cir.1988) (holding that draft forest plans and draft environmental impact statements were protected from disclosure under Exemption 5).

█ The drafts here are not deliberative because nothing in the drafts "reflects an agency's preliminary positions or ruminations about a particular policy judgment." *Nat'l Assoc. of Home Builders*, 309 F.3d at 39 (internal quotation marks omitted).[7] Although the USFS argues that the drafts are deliberative because they "convey opinions and offer conclusions and methodology for [the] USFS to embrace or reject" (Def.'s Summ. J. Mot. at 7), the record evidence shows that the USFS believed the drafts of the ecological assessment and the ecological assessment itself contain no recommendations or policy judgments and should be treated as purely factual documents. (*See* Pls.' Mot. to Expedite, Ex. A. at 5, 8, & 9.) Unlike the release of the draft forest plans at issue in *National Wildlife Federation*, the release of the HSEAC draft reports would not reveal "the Forest Service's judgment as to the appropriate balance to strike among the conflicting demands placed on the Forest's finite resources." *Nat'l Wildlife Federation*, 861 F.2d at 1120. The HSEAC was explicitly admonished not to include recommendations or opinions in the draft reports of the ecological assessment. (*See* Def.'s Summ. J. Mot., Reynolds Decl. ¶ 8.) Additionally, the drafts sent to the USFS employees can be dis-

7. Because the drafts do not qualify as deliberative documents, the court need not decide whether the drafts of the ecological assessment are predecisional.

**38**

closed without revealing any agency comments. To the extent that the comparison between the drafts and the final assessment would reveal any changes to the drafts the USFS employees' made, the release of the HSEAC drafts would not reveal the agency's deliberative process because the purpose of the agency's review—to produce the ecological assessment—did not culminate in a policy decision, and thus could not reveal any process by which such decisions are made. *See Nat'l Wildlife Federation*, 861 F.2d at 1118 (noting that a "document is considered part of the 'deliberative process' as long as it is 'actually ... related to the *process* by which policies are formulated'" (emphasis in original)). Finally, because the drafts consist only of factual narratives and summaries provided by a non-agency group to the USFS of material already available to the public, the release of the drafts will not chill the "frank and honest communication within the agency." *Coastal States Gas Corp.*, 617 F.2d at 866.[8] Therefore, the HSEAC draft reports are not protected by the FOIA and they must be released to the public under the FACA.

### CONCLUSION

Because the HSEAC is an advisory committee under the FACA and because the draft reports are not exempt under Exemption 5 of the FOIA, plaintiffs' cross-motion for summary judgment will be granted, and defendant's motion for summary judgment will be denied. A separate order accompanies this memorandum opinion.

---

8. The USFS cites *Cummock* to support its proposition that the FACA does not supercede the FOIA. The facts in *Cummock,* however, are inapposite as *Cummock* stated that disclosure under the FACA is required unless the agency has a valid claim under the FOIA. *Cummock,* 180 F.3d at 289–90.