65 A.3d 708

WATERKEEPER ALLIANCE, INC., et al.

v.

MARYLAND DEPARTMENT OF AGRICULTURE, et al.

No. 1289, Sept. Term, 2011.

Court of Special Appeals of Maryland.

May 2, 2013.

418

Jane Barrett (Andrew W. Keir, Environmental Law Clinic University of Maryland Francis King Carey School of Law, on the brief), Baltimore, MD, for Appellant.

Margaret Witherup (Gordon Feinblatt, LLC of Baltimore, MD), on brief; Thomas Filbert (Craig A. Nielsen, Douglas F. Gansler, Attorney General of Maryland, Annapolis, MD), on brief, for Appellees.

Panel: KRAUSER, C.J., GRAEFF and HOTTEN, JJ.[*]

HOTTEN, J.

This appeal concerns the Maryland Department of Agriculture's ("MDA") decision to exempt nutrient management plans ("NMPs")[1] from public disclosure in response to a Public Information Act request. An NMP "indicates how essential primary nutrients, that is, nitrogen, phosphorus, and potassium, are to be annually managed on farm fields for crop production and for the protection of water quality." COMAR 15.20.04.01 (2000). As discussed further, *infra,* the General Assembly promulgated a law governing the preparation and filing of NMPs and plan summaries. This law provides that "[t]he [MDA] shall maintain a copy of each [NMP] summary for 3 years in a manner that protects the identity of the individual for whom the [NMP] was prepared." Md.Code (1974, 2007 Repl.Vol.), § 8–801.1(b)(2) of the Agriculture Article[2] [hereinafter "Agric. § 8–801.1(b)(2)"].

---

[*] Judge Alexander Wright, Jr. did not participate in the Court's decision to designate this opinion for publication in the Maryland Appellate Reports pursuant to Maryland Rule 8–605.1

1. An NMP is "a plan prepared ... by a certified nutrient management consultant to manage the amount, placement, timing, and application of animal waste, commercial fertilizer, sludge, or other plant nutrients to prevent pollution by transport of bioavailable nutrients and to maintain productivity." Md.Code (1974, 2007 Repl.Vol., 2012 Supp.), § 8–801(c) of the Agriculture Article.

2. Md.Code (1974, 2007 Repl.Vol.), § 8–801.1(b)(2) of the Agriculture Article provides:
    (b) *Filing with [the MDA].*—(1) A summary of each nutrient management plan shall be filed and updated with the [MDA] at a time and in a form that the [MDA] requires by regulation.
    (2) The [MDA] shall maintain a copy of each summary for 3 years in a manner that protects the identity of the individual for whom the nutrient management plan was prepared.

Appellants, Waterkeeper Alliance, Inc. ("Waterkeeper Alliance"), Assateague Coastkeeper, Baltimore Harbor Waterkeeper, Inc., Lower Susquehanna Riverkeeper, Patuxent Riverkeeper, Potomac Riverkeeper, Inc., Severn Riverkeeper, South Riverkeeper, and West/Rhode Riverkeeper, Inc.,[3] filed a complaint, pursuant to the Public Information Act, specifically Md.Code (1984, 2009 Repl.Vol., 2012 Supp.), § 10–613(a) of the State Government Article [hereinafter "State Gov't § 10–613(a)"],[4] in the Circuit Court for Anne Arundel County against appellees, the MDA, the Secretary of Agriculture, Roger Richardson, the Assistant Secretary, Royden Powell, and the Chief of the Office of Resource Conservation, Louise Lawrence, alleging that the MDA improperly denied them evaluation of NMPs[5] for the Nest Egg Farm in Princess Anne, Maryland, and for Animal Feeding Operations ("AFOs")[6] that were located in the Chesapeake Bay watershed.[7]

---

3.  According to the complaint, Waterkeeper Alliance "is an international non[-]profit conservation and advocacy organization incorporated in New York ... that connects and supports 172 local Waterkeeper programs, including 11 programs with watersheds in the State of Maryland, ... [and it] has interest in ensuring citizen access to information and in protecting and improving the water quality of Maryland's waters and ensuring the health of Maryland's communities." The remaining appellants are member programs of Waterkeeper Alliance.

4.  State Gov't § 10–613(a) provides:
    (a) *In general.*—(1) Except as otherwise provided by law, a custodian shall permit a person or governmental unit to inspect any public record at any reasonable time.

5.  Pursuant to State Gov't § 10–623(a), "[w]henever a person or governmental unit is denied inspection of a public record, the person or governmental unit may file a complaint with the circuit court for the county where: (1) the complainant resides or has a principal place of business; or (2) the public record is located."

6.  "An AFO is defined as a lot or facility where (1) animals (other than aquatic animals) have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12–month period, and (2) crops, forage, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility." *Assateague Coastkeeper et al. v. Maryland Dep't of the Environment*, 200 Md.App. 665, 668, n. 1, 28 A.3d 178 (2011), *cert. denied* 424 Md. 291, 35 A.3d 488 (2012) [hereinafter *"Assateague Coastkeeper"*] (internal quotations omitted).

7.  "A watershed is the area of land where all of the water that is under it

After being notified of a possible disclosure,[8] appellee, the Maryland Farm Bureau, Inc. ("Farm Bureau") filed a motion for summary judgment, averring that Agric. § 8–801.1(b)(2) required that the MDA maintain all NMPs in a manner that protected its members' identities beyond three years. Thereafter, the MDA filed a cross-motion for summary judgment. The circuit court granted the MDA's cross motion for summary judgment, but denied the Farm Bureau's motion for summary judgment. The court ordered that the MDA disclose NMP summaries that were older than three years "without any redaction of identifying information unless failure to redact identifying information from [NMP] [s]ummaries . . . would allow for the identification of the individual for whom the [NMP] was prepared."

Subsequently, the Farm Bureau filed a motion for clarification to which the court further ordered that the MDA "redact any plan information that could be used to create a linkage between a specific individual and a specific [NMP]," and redact "entries for name, address, signature, and unique identification number." Appellants, the Waterkeepers, noted an appeal, and present the following question for our consideration:

Did the [c]ircuit [c]ourt err when it interpreted section 8–801.1(b)(2) of the Agriculture Article ("the Statute")[9] to

---

or drains off of it goes into the same place." *Water: Watersheds,* UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Mar. 6, 2012, http://water.epa.gov/type/watersheds/whatis.cfm (last visited Apr. 11, 2013).

8. "Unless prohibited by law, the custodian should notify any person who could be adversely affected by disclosure of a record that at a request for inspection or copying of the record has been made. . . ." COMAR 15.01.04.08 (1988).

9. Appellants referred to Agric. § 8–801.1(b)(2) as "the Statute" throughout their brief. However, for purposes of this opinion, we do not refer to it as such, as we discuss several statutes.

include any documents related to nutrient management plans ("NMPs"), when the [s]tatute expressly applies only to NMP summaries maintained by the Maryland Department of Agriculture ("MDA") for three years or less?

For the reasons that follow, we shall affirm the judgment of the circuit court.

## STATUTORY BACKGROUND

### A. Federal Regulatory Framework

In 1948, the United States ("U.S.") Congress enacted the Federal Water Pollution Control Act to promote states to safeguard and restore the country's bodies of water. *National Pork Producers Council v. Environmental Protection Agency*, 635 F.3d 738, 742 (5th Cir.2011) [hereinafter *"National Pork"*]. In 1972, the Clean Water Act[10] replaced the Federal Water Pollution Control Act, and encompassed a responsibility to conform to the 1972 National Pollutant Discharge Elimination System ("NPDES") permit program. *Id.* Although the Clean Water Act forbids the release of pollutants into U.S. waters, under the permit program, the EPA may grant permits to individuals and companies to discharge pollutants, but with significant limitations. *Id.* at 743.

In 1976, the EPA required Concentrated Animal Feeding Operations ("CAFOs")[11] to obtain permits to release pollu-

---

10. The Clean Water Act is the primary legislation, which empowers the U.S. Environmental Protection Agency ("EPA") to decrease and control water deterioration and degradation. *Waterkeeper Alliance, Inc. v. Environmental Protection Agency*, 399 F.3d 486, 491 (2nd Cir.2005).

11. The number of animals that qualify [as] a facility housing poultry as a Concentrated Animal Feeding Operation ("CAFO") depends on the type of manure handling system employed. A facility qualifies as a CAFO with fewer chickens or laying hens if it operates a liquid, as

tants, which was predicated on the amount of animals located in the facility. *Id.* However, because of " 'changes that . . . occurred in the animal production industries,' " *Waterkeeper Alliance, Inc. v. Environmental Protection Agency,* 399 F.3d 486, 494 (2nd Cir.2005) [hereinafter *"Waterkeeper Alliance v. EPA "*] (additional citation omitted), the EPA required **all** CAFOs to "apply for an individual NPDES permit or submit a notice of intent for coverage under an NPDES general permit" in 2003.[12]  *Id.* at 495 (citing 40 C.F.R. § 122.23(d)(1)) (emphasis added). Additionally, all CAFOs were required to establish and design a site-specified NMP that:

(i) Ensure[d] adequate storage of manure, litter, and process wastewater, including procedures to ensure proper operation and maintenance of the storage facilities;

(ii) Ensure[d] proper management of mortalities (i.e. dead animals) to ensure that they [were] not disposed of in a liquid manure, storm water, or process wastewater storage or treatment system that [was] not specifically designed to treat animal mortalities;

(iii) Ensure[d] that clean water [was] diverted, as appropriate, from the production area;

(iv) Prevent[ed] direct contact of confined animals with waters of the [U.S.];

(v) Ensure[d] that chemicals and other contaminants handled on-site [were] not disposed of in any manure, litter, process wastewater, or storm water storage or treatment

---

opposed to a dry, manure handling system.  40 C.F.R. §  122.23(b)(4), (b)(6) (2010).  For example, an AFO is defined as a Medium CAFO if: (1) it confines 9,000 to 29,000 laying hens or broilers and uses a liquid manure handling system;  or (2) it confines 25,000 to 81,999 laying hens or 37,500 to 124,999 chickens (other than laying hens), and it uses other than a liquid manure handling system.  *Id.[;]* § 122.23(b)(6)(i)(I)-(K).  An AFO is defined as a Large CAFO if: (1) it confines 30,000 laying hens or broilers and uses a liquid manure handling system;  or (2) it confines 82,000 laying hens or 125,000 chickens (other than laying hens), and it uses other than a liquid manure handling system.  *Id.[;]* § 122.23(b)(4)(ix)-(xi).
*Assateague Coastkeeper,* 200 Md.App. at 671, n. 5, 28 A.3d 178.

**12.**  We refer to these 2003 EPA requirements as the "2003 Rule."

system unless specifically designed to treat such chemicals and other contaminants;

(vi) Identif[ied] appropriate site specific conservation practices to be implemented, including as appropriate buffers or equivalent practices, to control runoff of pollutants to waters of the [U.S.];

(vii) Identif[ied] protocols for appropriate testing of manure, litter, process wastewater, and soil;

(viii) Establish[ed] protocols to land apply manure, litter or process wastewater in accordance with site specific nutrient management practices that ensure appropriate agricultural utilization of the nutrients in the manure, litter or process wastewater; and

(ix) Identif[ied] specific records that [would] be maintained to document the implementation and management of the minimum elements described [above].

*Waterkeeper Alliance v. EPA,* 399 F.3d at 495–96 (quoting 40 C.F.R. § 122.42(e)(1)(i)-(ix)) (word "above" added in *Waterkeeper Alliance v. EPA,* 399 F.3d at 496).

In *Waterkeeper Alliance v. EPA,* 399 F.3d at 502, the U.S. Court of Appeals for the Second Circuit determined whether the requisites of the NMPs constituted "effluent limitations," and hence, were required in the NPDES permit.[13] The plaintiffs-environmental organizations contended that the 2003 Rule was unlawful because (1) NPDES personnel were permitted to issue permits to Large CAFOs without an extensive evaluation of the NMPs, and (2) the NPDES permits did not include the NMPs' terms. *Id.* at 490. The Second Circuit agreed with the plaintiffs, reasoning that the Clean Water Act described an effluent limitation as " 'any *restriction* established by a State or the Administrator on quantities, *rates,* and concentrations of chemical, physical, biological, and other constituents which [were] discharged from point sources ...,' "

---

**13.** In *Waterkeeper Alliance v. EPA,* 399 F.3d at 491, the U.S. Court of Appeals for the Second Circuit stated, "[r]egardless of the issuer, every NPDES permit [was] statutorily required to set forth, at the very least, "effluent limitations' [] ...."

*id.* at 502 (emphasis in original), and thus, because "the requirement to develop a[NMP] constitute[d] a restriction on land application discharges . . .," the requisites of the NMP should have been included in the permits. *Id.*

In accordance with the Second Circuit's ruling, on June 30, 2006, the EPA proposed that (1) CAFOs present NMPs with their NPDES permit applications, (2) authorities would review the plan, and (3) the permit would include the NMP terms. 71:126 Fed.Reg. 37744 (June 30, 2006). On December 4, 2008, the proposal became finalized as a rule.[14] *National Pork,* 635 F.3d at 747. Farmers opposed the 2008 Rule, and filed complaints in several federal courts, arguing that the EPA exceeded its authority in requiring all NMPs to submit procedures regarding land application.[15] *Id.* at 753. The actions were transferred to the U.S. Court of Appeals for the Fifth Circuit, and joined into one case, *National Pork. Id.* at 747. The Fifth Circuit concluded that the farmers' arguments were time-barred because they concerned the 2003 Rule, *id.* at 754, and ultimately, the Court upheld the 2008 Rule.[16] *Id.* at 756.

## B. Maryland Regulatory Framework

The MDA establishes programs regarding "the registration, labeling and application of commercial fertilizers, organic nutrients, organic wastes, soil conditioners and soil amendments." MDA, GUIDELINES FOR APPLICATION OF SOIL CONDITIONERS, SOIL AMENDMENTS, WASTE MATERIALS OR EFFLUENT ON

---

14. We refer to this proposal as the "2008 Rule."

15. Land application is the treatment of animal waste from CAFOs that are applied to cultivated lands for fertilizer. *National Pork,* 635 F.3d at 753, n. 39.

16. On October 13, 2012, the EPA announced a proposed rule, in response to *National Pork,* regarding the reduction of "the potential impact of the EPA's CAFO regulations on small entities by reducing the universe of CAFOs that must apply for NPDES permits." The public comment period ended on March 1, 2013. 77:211 Fed.Reg. 65840, 65842 (October 31, 2012). *See also CAFO Rule History,* U.S. EPA, Jan. 3, 2013, http://cfpub.epa.gov/npdes/afo/aforule.cfm (last visited Apr. 11, 2013).

AGRICULTURAL LAND (SUMMARY OF EXISTING GUIDELINES) 1
(2012), http://mda.maryland.gov/resource_conservation/
counties/Supp7% 20(2).pdf (last visited Apr. 11, 2013). "The
Maryland Department of the Environment ... develop[s]
standards and issues discharge permits for, and oversees the
safe permissible uses of, solid and liquid byproducts, including
those with heavy metals, trace elements, and other pre-appli-
cation treatment requirements, for various land treatment and
water reuse systems." *Id.*

Similar to federal law, Maryland forbids the release of
pollutants into its waters,[17] unless the Department of the
Environment grants a general discharge permit. *Assateague
Coastkeeper,* 200 Md.App. at 677, 28 A.3d 178 (citing Md.Code
(1996, 2007 Repl.Vol.), §§ 9–101(*l* ), 9–322, 9–323 of the Envi-
ronment Article). On September 12, 2008, the Department of
the Environment amended the general permit to encompass
two types of AFOs: "CAFOs, [which] are AFOs that dis-
charge to surface waters, [and] are covered by the [Clean
Water Act] and must obtain a NPDES permit issued by [the
Department of the Environment] ... [and] ... [t]he second
category, an AFO that qualifies as a CAFO under federal
regulations, but does not discharge or propose to discharge
surface water, [which] is classified as a MAFO [ (Maryland
Animal Feeding Operation) ]." *Assateague Coastkeeper,* 200
Md.App. at 678–79, 28 A.3d 178 (citing 35:19 Md. Reg. 1735,
1737 (September 12, 2008)); General Discharge Permit for
Animal Feeding Operations, Part I.A1; COMAR
26.08.03.09B(3) (2009); and COMAR 26.08.03.09B(1)(d). Pur-

---

**17.** Pursuant to Md.Code (1996, 2007 Repl.Vol., 2012 Supp.), §§ 9–
101(*l* ) of the Environment Article, Maryland waters include:

(1) Both surface and underground waters within the boundaries of
this State subject to its jurisdiction, including that part of the Atlantic
Ocean within the boundaries of this State, the Chesapeake Bay and
its tributaries, and all ponds, lakes, rivers, streams, public ditches, tax
ditches, and public drainage systems within this State, other than
those designed and used to collect, convey, or dispose of sanitary
sewage; and
(2) The flood plain of free-flowing waters determined by the Depart-
ment of Natural Resources on the basis of the 100–year flood frequen-
cy.

suant to federal law, to obtain a permit, the CAFOs and MAFOs must create and design NMPs to submit with their permit applications. *Assateague Coastkeeper*, 200 Md.App. at 679, 28 A.3d 178.

Regarding Maryland's nutrient management law, in September 1997, the General Assembly and a governor-appointed commission examined events concerning fish contamination in Maryland's Lower Eastern Shore, Dep't of Legis. Servs., Revised Fiscal Note, S.B. 178 (1998), which indicated the presence of toxic dinoflagellate, Pfiesteria.[18] *Id.* After further research, scientists found a causal nexus between Pfiesteria and "the role of the chicken industry and the enormous quantities of chicken litter generated and ultimately applied to local fields as fertilizer for crop production." *Id.* As a result, the Water Quality Improvement Act of 1998 applied to "[a]n agricultural operation with [more] than $2,500 in gross income; or [a] livestock operation with [more] than eight animal units defined as 1,000 pounds of live animal weight per animal unit." Agric. § 8–803.1(b). It certified that those farmers and land cultivators, who used chemical fertilizers, sludge,[19] or animal waste, would meet their nutrient needs concerning farm profits, while minimizing nutrient losses to soil, and restoring Maryland's waterways, specifically the Chesapeake Bay. *See* Agric. §§ 8–801.1(a) and 8–803.1(e).

The U.S. EPA and U.S. Department of Agriculture have indicated that NMPs should address "feed management, manure handling and storage, land application of manure, land management record keeping, and other utilization options." U.S. DEPARTMENT OF AGRICULTURE AND U.S. EPA, UNIFIED

---

18. Dinoflagellate is "[a] plantlike flagellate of the subclass Phytomastigophorea, some species of which ... produce a potent neurotoxin that may cause severe food intoxication following ingestion of parasitized shellfish." STEDMAN'S MEDICAL DICTIONARY 399 (24th ed. 1982).

19. Sludge means "any solid, semisolid or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant, or air pollution control facility or any other such waste having similar characteristics and effects." 42 U.S.C.A. § 6903(26A) (2012).

NATIONAL STRATEGY FOR ANIMAL FEEDING OPERATIONS 5, (1999), http://www.epa.gov/npdes/pubs/finafost.pdf (last visited Apr. 11, 2013).

In Maryland, the NMP process incorporates:

[ (i) ]  Soil Samples: Soil samples are needed from every management unit on the farm property.  Management units should ideally be each field that is used for crops, grazing or hay production.  Pastures are included in fields that should be tested.  Sacrifice lots and holding pens do not need to be tested unless there are plans to apply manure or fertilizer to them. . . .

[ (ii) ]  Manure Samples: If manure is to be applied to fields, a manure sample to determine nutrient concentrations will be required.

[ (iii) ]  Property Tax [Identification ("ID") ] Number: The proper tax ID number for each parcel of land that is farmed must be listed in the NMP. . . .

[ (iv) ]  Property Maps: Property maps may be hand drawn or made from a computer application. . . . The main concerns are that the property and field boundaries are identified with acreage, and roads accessing the property are labeled.

[ (v) ]  Crop Grown: Identify the predominant type of grass grown in the fields . . . .

[ (vi) ]  Crop Yields: If hay is grown and harvested from the fields, the amount produced per acre (ton/acre) is required.

[ (vii) ]  Animals: The total number, type and weight of animals . . . is required.

[ (vii) ]  Bedding: The type and total amount of bedding used is required.

[ (viii) ]  Turnout Schedule: The number of hours [animals] are kept confined [versus] allowed access to pasture is required. . . . The amount of time confined relates to the amount of manure that is collected.

[ (ix) ] Manure Storage: Method of manure storage and dimensions of the storage structure are needed.

[ (x) ] Manure Application Rate: If manure is spread, the spreader must be calibrated to determine the rate of application (tons/acre)....

[ (xi) ] Transported Manure: If manure is transported off the farm, information on where manure is transported must be recorded....

UNIVERSITY OF MARYLAND, NUTRIENT MANAGEMENT PLANS FOR MARYLAND HORSE FARMS 1–2, (2011), http://www.ansc.umd.edu/ ERG/doc/EBR–14.pdf (last visited Apr. 11, 2013) (underlines omitted). *See also* Nutrient Management Plan Reporting Form, Parts B and C.

After the information is collected, the permit applicant must file a summary of each NMP with the MDA, and it shall retain a copy for three years in a manner that safeguards the applicant's identity. *See* Agric. § 8–801.1(b). Pursuant to the Public Information Act, the public "may request to inspect or copy public records of the [MDA]," COMAR 15.01.04.03 (1988), including NMP summaries, and "[i]t is the policy of the [MDA] to facilitate public access to the records ..., when access is allowed by law, by minimizing costs and time delays to persons requesting information." COMAR 15.01.04.01 (1988).

## FACTUAL AND PROCEDURAL BACKGROUND

On June 14, 2007, Waterkeeper Alliance submitted a Public Information Act request to the MDA regarding several agricultural records. However, pertinent to the case at bar are the inspections relating to (1) NMPs for the Nest Egg Farm in Princess Anne, Maryland, and (2) NMPs for AFOs with approximately 125,000 broiler chickens that conducted waste management practices and were located in the Chesapeake Bay watershed. On July 17, 2007, the MDA denied access to the Waterkeeper Alliance, alleging that disclosure would be contrary to the Water Quality Improvement Act. Waterkeeper Alliance presented an additional request on July 30, 2007,

regarding "the owner name, facility name, address, county, phone number, longitude, latitude, and type of operation, of all poultry farms in ... Maryland." On August 27, 2007, the MDA again denied the Waterkeeper Alliance access to the records.

Subsequently, on February 5, 2008, appellants filed a complaint in the Circuit Court for Anne Arundel County against the MDA and its administrators, alleging that "Maryland law keeps confidential a summary of an NMP only to the extent that the *identity* of the individual for whom the NMP was prepared would be revealed," but the MDA "broadly and inappropriately refused to disclose any and all portions of NMPs." (emphasis in original). On May 16, 2008, appellants submitted a third request, relating to enforcement records and NMPs that were filed within and over the previous three years for AFOs in several counties, including Dorchester County. The MDA surmised that these records could be disclosed, but indicated that the requested enforcement records were still under evaluation.

After being notified of possible disclosure, on July 18, 2008, the Farm Bureau brought an action in the Circuit Court for Dorchester County against the MDA to prevent the disclosure of confidential information, averring that Agric. § 8–801.1(b)(2) required that the MDA protect its members' identifies beyond three years. On July 25, 2008, the MDA filed a motion to transfer the Farm Bureau's action to the Circuit Court for Anne Arundel County. On August 8, 2008, the Farm Bureau filed an opposition to the motion, a motion to proceed anonymously, and a motion for protective order, avowing that (1) the cases involved different parties, (2) its members would be unduly inconvenienced, and that (3) the request interfered with the members' rights to privacy. On August 13 and August 22, 2008, the MDA filed its respective reply and opposition, as well as a motion to strike and to dismiss the Farm Bureau's complaint. On September 2, 2008, the Circuit Court for Dorchester County granted the MDA's motion to transfer.

On September 15, 2008, the MDA filed a motion to consolidate the Farm Bureau's case with appellants' action. The Farm Bureau filed a motion for summary judgment on September 29, 2008. Thereafter, the MDA filed a cross-motion for summary judgment and an opposition to the Farm Bureau's motion for summary judgment. On October 30, 2008, appellants filed their opposition to the Farm Bureau's motion for summary judgment and their motion in support of the MDA's motion for summary judgment. On November 7, 2008, the Farm Bureau filed a motion for preliminary injunction, requesting that the court prevent the MDA from disclosing the farmers' information.

A motions hearing was held on December 8, 2008, and on February 19, 2009, the court filed a memorandum opinion and order [hereinafter "2009 order"], which granted the MDA's cross-motion for summary judgment, and denied the Farm Bureau's motion for summary judgment.

The court:

**DECLARED,** that the [MDA] must disclose [NMP] [s]ummaries that have been maintained by the [MDA] for 3 years or less pursuant to the Public Information Act with the limitation that the [MDA] must redact any and all information from the [NMP] [s]ummaries that may allow for the identification of the individual for whom the [NMP] was prepared; and it is further

**DECLARED,** that the [MDA] must disclose [NMP] [s]ummaries that have been maintained by the [MDA] for more than three years without any redaction of identifying information unless failure to redact identifying information from [NMP] [s]ummaries that have been held for more than three years would allow for the identification of the individual for whom the [NMP] was prepared with respect to those [NMP] [s]ummaries that have been maintained by the [MDA] for three years or less; and it is further

**DECLARED,** that the [MDA] must redact any information from any documents subject to disclosure under the Public Information Act that are related to [NMPs] if such

information would allow for the identification of the individual for whom the [NMP] was prepared with respect to those [NMP] [s]ummaries that have been maintained by the [MDA] for three years or less.

On April 2, 2010, one of the appellants, Assateague Coastkeeper, filed a request concerning NMPs and reports regarding any Worcester County farm that violated the provisions of the Water Quality Improvement Act during 2007 through 2010. In response, the MDA "proposed that, instead of providing hard-copies of such records, it could search its database and provide this information more efficiently in a spreadsheet but, to comply with [Agric.] § 8–801.1(b)(2) and the court's order, it would be required to redact any plan information." On September 6, 2010, the Farm Bureau sent a letter to the MDA, stating, "[c]learly, the excel spreadsheets [20] that have been created to respond to the [Public Information Act] request fall into the "any document" category cited by [the] judge. . . . Clearly, the document is related to nutrient management plans. And clearly, the name, address, zip code, party id [sic], and operator voucher id [sic] number would allow for the identification of the individual for whom a nutrient management plan was prepared." As a result, the Farm Bureau requested that all identifying information from the spreadsheets be redacted.

On September 13, 2010, the Farm Bureau filed a new action against the MDA in the Circuit Court for Worcester County. On September 22, 2010, Assateague Coastkeeper filed a petition for contempt in Anne Arundel County, avowing that the MDA did not permit it to inspect and copy public records in accordance with the court's 2009 order. It requested that the court compel the MDA to disclose the NMPs. Thereafter, the MDA filed a motion to transfer the Farm Bureau's action to Anne Arundel County, and on September 24, 2010, the Circuit Court for Worcester County granted the MDA's motion to transfer.

---

20. According to the MDA, there was only one spreadsheet.

On May 2, 2011, the Circuit Court for Anne Arundel County dismissed the Farm Bureau's action, and instructed the MDA not to release any of the contested records. On May 9, 2011, the Farm Bureau filed a motion for clarification of the court's 2009 order, requesting that "the [c]ourt issue an [o]rder clarifying its February 10, 2009 [m]emorandum [o]pinion and [o]rder and declar[e] that the [MDA] must redact any fields of information from its [e]xcel spreadsheet that would identify the farmers for whom the nutrient management plans were prepared." [21] On June 14, 2011, Assateague Coastkeeper and the MDA filed their respective oppositions to the motion for clarification. On July 14, 2011, the court issued its second order [hereinafter "2011 order"], granting the Farm Bureau's motion for clarification, stating:

ORDERED and DECLARED that the [MDA] must redact any information from any documents subject to disclosure under the Public Information Act that are related to [NMPs] if such information would allow for the identification of the individual for whom the [NMP] was prepared with respect to those [NMP] [s]ummaries that have been maintained by the [MDA] for three years or less. In applying this standard, the [MDA] must redact only that information ... with a specific [NMP]; and it is further:

ORDERED and DECLARED that, as applied to the spreadsheet of enforcement information that the [MDA] will provide to the Assateague Coastkeeper, the [MDA] must redact the following fields of information in their entirety ...:

■ ...—Visit Type[s], Operation Type[s]

\*     \*     \*

■ ...—Total Farmed Acres

\*     \*     \*

---

**21.** It is important to note that the motion for clarification was not a motion to reconsider, revise, and/or amend, but a request to clarify the court's 2009 order.

In addition, the [MDA] must review the following fields of information and redact any plan information that could be used to create a linkage between a specific individual and a specific [NMP]:

■ . . .—Compliance Comments

         *      *      *

and it is further:

ORDERED and DECLARED that, in redacting identifying information from [NMP] summaries or annual implementation reports, the [MDA] must redact the entries for name, address, signature, and unique identification number . . . .

IT IS SO ORDERED.

(signature omitted)

Appellants noted a timely appeal.[22]

### DISCUSSION

**Whether The Circuit Court Erred In Permitting Disclosure of NMPs That Were Beyond Three Years While Ordering That The MDA Redact Specific Information.**

The Water Quality Improvement Act, specifically Agric. § 8–801.1(b)(2), provides:

(b) *Filing with [the MDA].*—(1) A summary of each [NMP] shall be filed and updated with the [MDA] at a time and in a form that the [MDA] requires by regulation.

(2) The [MDA] shall maintain a copy of each summary for 3 years in a manner that protects the identity of the individual for whom the [NMP] was prepared.

The issue in the case at bar is whether the MDA must maintain NMP documents that are beyond three years to safeguard the general permit applicant's identity in response to a Public Information Act request regarding disclosure of those NMPs.

---

22. Appellants filed their notice of appeal on August 16, 2011. Although the court's order was issued on July 14, 2011, it was not filed until July 18, 2011, so the notice of appeal was timely.

Pursuant to the Public Information Act, specifically State Gov't § 10–615,

> A custodian shall deny inspection of a public record [23] or any part of a public record if:
>
> (1) by law, the public record is privileged or confidential; or
>
> (2) the inspection would be contrary to:
>
> (i) a State statute;
>
> (ii) a federal statute or regulation that is issued under the statute and has the force of law;
>
> (iii) the rules adopted by the Court of Appeals;  or
>
> (iv) an order of a court of record.

### A.) Whether The General Assembly Only Intended To Protect NMP Summaries.

█ It is undisputed that the NMPs in the instant case fell within the purview of a "public record," so we examine the parties' contentions.  Appellants maintain that the court erroneously held that any information relating to NMPs were protected because the statute only safeguards identifying information contained in NMP summaries.  The MDA avers that nutrient management records are given the same protection as plan summaries.

---

**23.** Pursuant to State Gov't § 10–611(g)(1), a public record is

(g) *Public record.*—(1) "Public record" means the original or any copy of any documentary material that:

(i) is made by a unit or instrumentality of the State government or of a political subdivision or received by the unit or instrumentality in connection with the transaction or public business;  and

(ii) is in any form, including:

1. a card;
2. a computerized record;
3. correspondence;
4. a drawing;
5. film or microfilm;
6. a form;
7. a map;
8. a photograph or photostat;
9. a recording;  or
10. a tape.

A question regarding statutory interpretation is a legal question, which we review *de novo.* *Harvey v. Marshall,* 389 Md. 243, 257, 884 A.2d 1171 (2005) (citing *Mohan v. Norris,* 386 Md. 63, 66–67, 871 A.2d 575 (2005)); *see also Davis v. Slater,* 383 Md. 599, 604, 861 A.2d 78 (2004) (Maryland appellate courts review issues *de novo* to decide if the circuit court was legally correct in its interpretations of the Maryland Code.). "The fundamental goal of statutory construction is to ascertain and effectuate the intention of the [l]egislature," *Witt v. Ristaino,* 118 Md.App. 155, 162, 701 A.2d 1227 (1997) (citing *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995)), as well as "the ends to be accomplished, or the evils to be remedied by a particular provision[.]'" *Whitley III, et al. v. Maryland State Bd. of Elections, et al.,* 429 Md. 132, 149, 55 A.3d 37 (2012) (citing *Barbre v. Pope,* 402 Md. 157, 172, 935 A.2d 699 (2007)).

To construe the intent, we start by observing the plain meaning of the statutory terminology, *Bornemann v. Bornemann,* 175 Md.App. 716, 724, 931 A.2d 1154 (2007) (citing *Reier v. State Dept. of Assessments and Taxation,* 397 Md. 2, 26, 915 A.2d 970 (2007)), so that "'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory[.]'" *Whitley,* 429 Md. at 149, 55 A.3d 37. "... When the plain meaning is clear and unambiguous, and consistent with both the broad purposes ... of the provision being interpreted ...," we end our search, *Assateague Coastkeeper,* 200 Md.App. at 709, 28 A.3d 178 (quoting *Wal Mart Stores, Inc. v. Holmes,* 416 Md. 346, 359, 7 A.3d 13 (2010)) (quoting *Schlosser v. Uninsured Employers' Fund,* 414 Md. 195, 203–04, 994 A.2d 956 (2010)), except in the "interest of completeness." *See Whitley,* 429 Md. at 155, 55 A.3d 37. If the language is ambiguous and susceptible to more than one meaning, we examine intent from the legislative history, as well as "case law, purpose, structure, and overarching statutory scheme in aid of searching for the intention of the legislature." *Id.* at 149, 55 A.3d 37. *See also Bornemann,* 175 Md.App. at 724, 931 A.2d 1154 (citing *Evans v. State,* 396 Md. 256, 341, 914 A.2d 25 (2006); *Allstate Ins. Co. v. Kim,* 376 Md.

276, 290, 829 A.2d 611 (2003)). The overall purpose, legislative history, and the statute's language is analyzed in its entirety to elucidate the inconsistencies and ambiguities. *Assateague Coastkeeper,* 200 Md.App. at 709, 28 A.3d 178 (quoting *Wal Mart Stores, Inc. v. Holmes,* 416 Md. 346, 359, 7 A.3d 13 (2010)) (quoting *Schlosser v. Uninsured Employers' Fund,* 414 Md. 195, 203–04, 994 A.2d 956 (2010)).

Furthermore, " '[w]hen faced with a problem of statutory construction, [the Court of Appeals] [has] show[n] great deference to the interpretation given the statute by the officers or agency charged with its administration.' " *Jordan Towing, Inc. v. Hebbville Auto Repair, Inc.,* 369 Md. 439, 459, 800 A.2d 768 (2002) (quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)). The Court of Appeals has stated:

> [A] court's task on review is not to substitute its judgment for the expertise of those persons who constitute the administrative agency. Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts.

*Assateague Coastkeeper,* 200 Md.App. at 709, 28 A.3d 178 (quoting *Headen v. Motor Vehicle Admin.,* 418 Md. 559, 570, 16 A.3d 196 (2011)) (quoting *Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 68, 729 A.2d 376 (1999)) (quotations omitted).

We first examine the plain language of Agric. § 8–801.1(b)(2), which states that the MDA "shall maintain a copy of each summary for 3 years...." Appellants maintain that the statute only pertains to NMP summaries. The MDA avows that nutrient management records are given the same protection as plan summaries. As Judge Glenn Harrell for the Court of Appeals recently asserted in *Whitley,* 429 Md. at 155, 55 A.3d 37 " '[e]ven when the language of a statute is free from ambiguity, in the interest of completeness[,] we may ... explore the legislative history of the statute under review

...[.] [T]he resort to legislative history is a confirmatory process; it is not undertaken to contradict the plain meaning of the statute.' " (quoting *Mayor & City Council of Balt. v. Chase*, 360 Md. 121, 131, 756 A.2d 987 (2000)). As a result, in the case at bar, we examine the legislative history.

The origin of Agric. § 8–801.1(b)(2) is found in the Water Quality Improvement Act. This landmark legislation offered guidance to other states regarding the control of nutrient levels in waterways. U.S. EPA, *Special Focus Issue: Controlling Nutrients [T]hrough State–Based Authorities*, NONPOINT SOURCE NEWS-NOTES, May 2012, at 7, *available at* http://water.epa.gov/polwaste/nps/outreach/upload/91issue.pdf (last visited Apr. 11, 2013). Senate Bill 178 of the 1998 General Assembly was introduced because of the contaminated fish occurrences in Maryland's Lower Eastern Shore. Dep't of Legis. Servs., Revised Fiscal Note, S.B. 178 (1998). This new bill gained opposition from agriculturalists because its purpose was to "replace [the] voluntary, nitrogen-based, agricultural nutrient management program with a phosphorus and nitrogen-based program." *Id.* Rural legislators introduced a counter bill, the "Nutrient Management Practices Improvement Act of 1998." *See* Amendments to H.B. 599 (Third Reading File Bill), 412th Gen. Assem., Reg. Sess. (Md.1998). After several compromises regarding both bills, the Water Quality Improvement Act was passed and enacted in May 1998. Dep't of Legis. Servs., Revised Fiscal Note, S.B. 178 (1998).

When originally enacted, Agric. § 8–801.1 stated "**each nutrient management plan** shall be filed with the [MDA] when it is developed; and each time it is updated." *See* Amendments to H.B. 599 (Third Reading File Bill), 412th Gen. Assem., Reg. Sess. (Md.1998) (emphasis added) (capital letters and roman numerals omitted). However, in 2004, the General Assembly amended the statute to read "**a summary of each nutrient management plan** shall be filed and updated with the [MDA] ... " at a time and in a form that the MDA requires by regulation. S.B. 182, 418th Gen. Assem., Reg. Sess. (Md.2004) (emphasis added) (capital letters omitted).

Maryland is not the only state that requires a summary to be filed. Delaware's regulation concerning pollution from private lands into its watersheds provides that "[t]he home-owner's association must retain the [NMP] on file and maintain records of nutrient applications. A summary of nutrient application records must be submitted to the Delaware Department of Agriculture, Nutrient Management Program on an annual basis." *Delaware Dep't of Natural Res. & Envtl. Control v. Sussex County,* 34 A.3d 1087, 1094 (Del.2011).

We perceive that the General Assembly may have amended the statute because agricultural plans are voluminous, expensive, and time-consuming. For example, in *Goldschmidt v. U.S. Dep't of Agriculture,* 557 F.Supp. 274, 275 (D.D.C.1983), the U.S. District Court for the District of Columbia determined whether inspection reports were "investigatory reports compiled for law enforcement purposes" concerning the inspection of meat and poultry, and thereby, exempt from public disclosure when a Freedom of Information Act ("FOIA") request was submitted. Regarding the inspection reports and the summaries, the court stated:

> Prior to May of 1982, the [Food Safety and Inspection Service ("FSIS")] Review Staff routinely wrote up [inspection location reports] for every establishment reviewed irrespective of whether any serious violations of regulations were found. The [inspection location report] contained a list of all deficiencies noted by the reviewer, no matter how minor.
>
>    *    *    *
>
> In May[ ] 1982, that policy was changed. Instead of preparing an [inspection location report] for each establishment reviewed, FSIS Review Staff prepared circuit reports which summarized general conditions in an FSIS circuit. However, if the reviewer noted conditions in a particular plant that posed a "serious" violation of regulations, an individual [inspection location report] would also be prepared and attached to the circuit summary report.

*Id.* at 275. Hence, it is logical to require "summations or compilations of what the records contain . . ." as opposed to extensive documents. *Chapman v. State,* 331 Md. 448, 461, 628 A.2d 676 (1993) (citation omitted).

More importantly, the authority that the General Assembly delegated to the MDA includes "a broad power to promulgate legislative-type rules or regulations in order to implement the statute." *Adventist Health Care, Inc. v. Maryland Health Care Comm'n,* 392 Md. 103, 119, 896 A.2d 320 (2006) (quoting *Christ v. Department of Natural Resources,* 335 Md. 427, 445, 644 A.2d 34 (1994)). The MDA promulgated COMAR 15.20.07.06(A)(4), which states that the MDA "shall keep, and shall protect the confidentiality of, **all nutrient management plan information submitted,** so as to protect the identity of the person for whom the plan was developed." (emphasis added). The MDA asserts that it has applied this regulation to NMP information associated with summaries, but also plan information relating to conducting an on-farm audit. Because our Courts have "frequently give[n] weight to an agency's experience in interpretation of a statute that it administers," *Cosby v. Dep't of Human Res.,* 425 Md. 629, 638, 42 A.3d 596 (2012), we respect the MDA's expertise, and defer to its interpretation that nutrient management records must also be safeguarded.

### B.) Whether The General Assembly Only Intended To Protect Applicant's Identification For "Three Years."

█ Concerning the "three years" requirement, appellants maintain that the circuit court erred because Agric. § 8–801.1(b) "clearly and unambiguously limits its scope to NMP summaries maintained by [the] MDA for three years or less and protects only the identifying information." The MDA asserts that Agric. § 8–801.1(b)(2) is silent on the issue, and that disclosing the NMP summaries that are more than three years old is consistent with the Public Information Act. The Farm Bureau argues that ". . . because many NMPs do not change significantly from one year to the next and if NMP

information were [sic] released to the public after three years, it would be very easy for someone to figure out the identity of the farmers who have current NMPs."

As previously indicated, we explore other sources " '[e]ven when the language of [the] statute is free from ambiguity, in the interest of completeness....' " *See Whitley,* 429 Md. at 155, 55 A.3d 37 (quoting *Mayor & City Council of Balt.,* 360 Md. at 131, 756 A.2d 987). Although we researched the legislative history regarding the first issue, the history does not guide us in construing the statute for the second issue.[24]

Appellate courts analyze the statutory scheme in its entirety and "attempt to harmonize provisions dealing with the same subject so that each may be given effect." *Henriquez v. Henriquez,* 413 Md. 287, 297–98, 992 A.2d 446 (2010) (quoting *Bowen v. City of Annapolis,* 402 Md. 587, 613–14, 937 A.2d 242 (2007)) (quoting *Kushell v. Dep't of Natural Res.,* 385 Md. 563, 577, 870 A.2d 186 (2005)). The Court of Appeals has further searched the "contested provisions of Maryland's ... Article[s] in the context of the statutory scheme as a whole and construe the plain language so that the various sections of the article do not conflict with one another." *Ctr. Ins. Co. v. J.T.W.,* 397 Md. 71, 81, 916 A.2d 235 (2007) (citing *Chow v. State,* 393 Md. 431, 443, 903 A.2d 388 (2006); *Deville v. State,* 383 Md. 217, 223, 858 A.2d 484 (2004); *Navarro–Monzo v. Washington Adventist,* 380 Md. 195, 204, 844 A.2d 406 (2004)). *See also Frey, et al. v. Comptroller of the Treasury,* 422 Md. 111, 183, 29 A.3d 475 (2011) (" '[W]hen two provisions 'relate to the same subject matter, and are not inconsistent with each other, they should be construed together and harmonized where consistent with their general object and scope.' ") (additional citations omitted). Hence, we review another section in the Agriculture Article, § 8–306, which was enacted in close proximity to Agric. § 8–801.1(b)(2).

---

**24.** From the onset of the introduced bills, the term "three years" has remained consistent, with no amendments.

Agric. § 8–306's genesis originated from House Bill 706 of the 1999 General Assembly. It was enacted "FOR the purpose of requiring the supervisors of a soil conservation district to provide the [MDA] and the Department of the Environment with any information in a soil conservation and water quality plan for certain purposes; authorizing the [MDA] to use the information for statistical purposes and to release the information to the Department of the Environment for a certain compliance or enforcement purpose. . . ." Amendments to H.B. 706 (Third Reading File Bill), 413th Gen. Assem., Reg. Sess. (Md.1999) (emphasis omitted).

Agric. § 8–306(b) provides, in pertinent part:

(b) *Maintenance of information from a soil conservation and water quality plan.*—(1) The supervisor shall maintain information from a soil conservation and water quality plan in a manner that protects the identity of the person for whom the plan is prepared. However, the supervisors shall make a soil conservation and water quality plan available to the Department of the Environment for enforcement action under § 4–413 of the Environment Article [25] and the Maryland Department of Agriculture which may use the information for statistical purposes.

(2) The Department shall:

(i) Maintain the information in the manner that protects the identity of the person whom the plan is prepared; and

---

**25.** Md.Code (1996, 2007 Repl.Vol.), § 4–413(b) of the Environment Article provides:

(b) *Agricultural land management practices.*—A person engaged in agricultural land management practices, . . . , may not add, introduce, leak, spill, or otherwise emit soil or sediment into waters of the State unless that person is implementing and maintaining a soil conservation and water quality plan approved by the local soil conservation district. If a person engaging in agricultural land management practices without a district approved soil conservation and water quality plan complies with an order for corrective action under § 4–412(a) of this subtitle, that person shall not be subject to penalties as provided under § 4–417 of this subtitle.

(ii) Make any information from a plan available to the Maryland Department of the Environment to support the development of a compliance or enforcement case for purposes of addressing an existing water quality problem in accordance with procedures established between the departments and the State Soil Conservation Committee.

Predicated on the language in Agric. § 8–306(b), and its reference to Md.Code (1996, 2007 Repl.Vol.), § 4–413(b) of the Environment Article, regarding prohibited behavior concerning soil and sediments into Maryland's waters, enforcement, and penalties, we deduce that the 1999 General Assembly did not include a time period in Agric. § 8–306(b) because this would have hindered the investigatory practices "relating to the character of soil erosion and the preventative and control measures needed ...," as well as "the development of a compliance or enforcement case for purposes of addressing an existing water quality problem...." *See* Agric. §§ 8–306(a)(1) and 8–306(b)(2)(ii).

During oral arguments, the MDA indicated that it surmised that the General Assembly introduced the "three years" limitation in Agric. § 8–801.1(b)(2) because soil testing and analysis are recommended every three years. According to the MDA's website, "[NMPs] are prepared by the Cooperative Extension and certified private consultants[,] and are revised every two to three years to incorporate new knowledge and address changes in crop management." *Nutrient Management Implementation Plan,* MDA, http://mda.maryland.gov/ resource_conservation/Pages/nmp.aspx (last visited Apr. 11, 2013). *See also* MDA, PLANT NUTRIENT RECOMMENDATIONS BASED ON SOIL TESTS FOR TURF MAINTENANCE 6 (2003), http:// mda.maryland.gov/resource_conservation/Documents/ consultant_information/2003% 20I–E1% 20p1–8% 20s5.pdf (last visited Apr. 11, 2013) (stating, "[a]fter the initial soil test, subsequent sampling every 3 years is generally sufficient to monitor soil [phosphorus] and [potassium] levels"); MDA, PLANT NUTRIENT RECOMMENDATIONS BASED ON SOIL TESTS FOR SOD PRODUCTION 5 (2003), http://mda.maryland.gov/resource_

conservation/Documents/consultant_information/2003% 20I–
B3% 20p1–7% 20s5.pdf (last visited Apr. 11, 2013) (stating,
"[f]or fields that have previously been in production, sampling
every 3 years is generally sufficient to monitor soil [phospho-
rus] and [potassium] levels").

According to the University of Maryland:

Soil testing is a useful tool that can help ensure the efficient
use of applied plant nutrients. Soil tests provide a means
for assessing the fertility status if a soil, but soil tests do not
provide a direct measure of the actual quantity of plant
available nutrients in the soil. Instead, soil tests measure
the quantity of a nutrient element that is extractable from a
soil by a particular chemical extracting solution. The meas-
ured quantity of extractable nutrient in a soil is then used to
predict the crop yield response to application of the nutrient
as fertilizer, manure, or other amendment. As soil test
levels increase for a particular nutrient, the expected crop
yield response to additions of that nutrient decreases.

FRANK J. COALE & JOSHUA McGRATH, UNIVERSITY OF MARYLAND,
SOIL FERTILITY MANAGEMENT 1 (2006), http://extension.umd.
edu/sites/default/files/_images/programs/anmp/SFM–4.pdf
(last visited Apr. 11, 2013). The "University System of Mary-
land—Soil Testing—Fees and Procedures" Statute,[26] which
originated from Senate Bill 416 and House Bill 952 of the 2000
General Assembly established a soil testing laboratory in the
University System of Maryland, which would:

. . . [E]stablish certain procedures and requirements for the
submission of certain soil samples; prohibiting certain soil
testing laboratories in the University System of Maryland
from charging a certain fee for a certain soil test under

---

**26.** This statute, which was codified as Md.Code (1974, 2001 Repl.Vol.),
§ 13–704 of the Education Article, is no longer written in the Article.
We perceive that it has been eradicated because the University of
Maryland Soil Testing Laboratory closed in June 2003. *See* Mary Ellen
Slayter, *Loss of soil lab lamented*, THE BALTIMORE SUN, Sept. 25, 2005,
*available at* http://articles.baltimoresun.com/2005–09–25/news/
0509240545_1_soiltesting-maryland-farmers-university-of-maryland
(last visited Apr. 11, 2013).

certain circumstances; and requiring certain laboratories to issue certain reports within a certain time frame.

S.B. 416, 414th Gen. Assem., Reg. Sess. (Md.2000).

As previously indicated, the 1998 and 1999 General Assemblies focused on controlling the levels of pollutants entering Maryland's waters, and attempted to solve this problem by enacting environmental statutes that encompassed different methods of deterrence. While soil testing regarding NMPs are revised every three years, Agric. 8–306's "[soil conservation and water quality plan] can be used for up to ten years without revision if substantial changes in management do not occur." *Soil Conservation Water Quality Plan Implementation*, MDA, http://mda.maryland.gov/resource_conservation/ Pages/scwqpi.aspx (last visited Apr. 11, 2013). This is logical because Agric. § 8–306's approach to prevent environmental deterioration and degradation of Maryland's waters is wider, concerning the management of erosion and runoff in an effort to maximize the best use of the soil and water via enforcement mechanisms. *See id.* However, Agric. § 8–801.1(b)'s method is narrower, focusing on the nutrients necessary to yield a productive crop, requiring farmers to "follow guidelines for the amount, timing, and placement of nutrients on each crop." *Nutrient Management Implementation Plan*, MDA, http:// mda.maryland.gov/resource_conservation/Pages/nmp.aspx (last visited Apr. 11, 2013).

As we noted previously, both Agric. §§ 8–306 and 8–801.1(b) refer to protecting the identity of the individual for whom the plans were prepared, but Agric. § 8–306 does not include any time period. If we conclude that the General Assembly intended to provide an exemption regarding NMP documents for three years, but after, the NMP records were unprotected, and could be disclosed, this interpretation would contradict Agric. § 8–306's language. Hence, the soil conservation and water quality plans would be forever exempt from disclosure. However, because our Courts have traditionally examined the statutory scheme in its entirety and in an "attempt to harmonize provisions dealing with the same subject so that each may be given effect," *Henriquez*, 413 Md. at 297–98, 992 A.2d 446

(quoting *Bowen,* 402 Md. at 613–14, 937 A.2d 242) (quoting *Kushell,* 385 Md. at 577, 870 A.2d 186), and "so that the various sections of the article do not conflict with one another," *Ctr. Ins. Co.,* 397 Md. at 81, 916 A.2d 235 (citing *Chow,* 393 Md. at 443, 903 A.2d 388; *Deville,* 383 Md. at 223, 858 A.2d 484; *Navarro–Monzo,* 380 Md. at 204, 844 A.2d 406), we deduce that the "three year" time period does not relate to the protection of the permit applicant's identification, but rather that the General Assembly included "three years" in Agric. § 8–801.1(b)(2) regarding the recommendation of soil testing.

While this issue is one of first impression in Maryland, other jurisdictions have considered whether NMPs are exempt from disclosure. In *Cmty. Ass'n for Restoration of the Env't v. Dep't of Ecology,* 149 Wash.App. 830, 205 P.3d 950, 961 (2009), the Washington Court of Appeals, Division Two, determined whether the Department of Ecology ("the Department") erred in permitting information to be redacted in dairy companies' NMPs. Under the pertinent Washington statute:

> In addition to the submission of [NMPs] to [the Department], the permit require[d] CAFOs to maintain " 'certain additional operational records onsite' " and make these records " 'available upon request by [the Department] and [the Department of] Agriculture." If a member of the public request[ed] information, [the Department] [would] request the information from the CAFOs. Under the permit, the CAFO must [have] suppl[ied] the information upon [the Department's] request. [The Department] [could] then determine on a "case-by-case" basis whether any of the requested information qualifie[d] as a confidential business record and [was], therefore exempt from public disclosure.

*Id.* at 955 (word "the Department of" added in *Cmty. Ass'n for Restoration of the Env't,* 205 P.3d at 955).

The Department provided a general permit to dairy companies regarding the release of nitrate pollutants. *Id.* at 953. The plaintiff-community organization filed a complaint with the Pollution Control Hearings Board ("the Board"), who

affirmed. *Id.* The plaintiff then filed a complaint with the circuit court, contending that "... [the Board] erred when it concluded that the permit ma[de] [NMPs] available for public review and further argue[d] that without the redacted information, citizens [would] not be able to determine whether observed CAFO activities [were] done pursuant to its [NMP] or in violation of that [NMP]." *Id.* at 961 (internal quotations omitted). The Department maintained that the Clean Water Act and state law protected information regarding trade secrets, and that its "case-by-case" analysis was reasonable. *Id.*

Under Washington's law, it states:

[W]henever any records or other information supplied to [the Department] "relate to the processes of production unique to the owner or operator thereof, or may affect adversely the competitive position of such owner or operator if released to the public or to a competitor, the owner or operator ... may so certify, and request that such information or records be made available only for the confidential use of [the Department]."

*Id.* at 961 (internal quotations omitted). The Washington appellate court stated that the statute granted the Department authority to decide whether a NMP constitutes a trade secret, *id.* at 962, and therefore deferred to the Department regarding the redaction of specific information. *See id.*

In *Idaho Conservation League, Inc. v. Idaho State Dep't of Agriculture,* 143 Idaho 366, 146 P.3d 632, 637 (2006), the Idaho Supreme Court decided whether NMPs constituted "public records," and thus, subjecting them to public disclosure. The plaintiff-environmental organization submitted a request to the Department of Agriculture ("the Department") regarding disclosure of feedlot operators' NMPs. *Id.* at 633. The Department failed to disclose the NMPs, averring that it did not have possession. *Id.* The plaintiff filed a complaint, and the circuit court held that "those NMPs need not be produced by [the Department] because they had been filed using the Idaho OnePlan computer format, and a statute direct[ed] information

so submitted [as] exempt from disclosure." *Id.* The Idaho statute provided that:

> ... To provide for the establishment and encouragement of the "Idaho OnePlan" as a primary computer-based conservation planning process for all natural resource concerns [...,] [t]he information provided by those using the "Idaho OnePlan" shall be deemed to be trade secrets, production records or other proprietary information and shall be kept confidential and shall be exempt from disclosure....

*Id.* at 634. The Department avowed that the public only had a right to inspect regarding NMPs that were in its possession. *Id.* Concerning the NMPs submitted electronically, the plaintiff maintained that only voluntary conservation plans were exempted. *Id.* at 636. The Idaho Supreme Court was unpersuaded by the Department's contention, stating that possession was irrelevant. *Id.* Regarding the plaintiff's assertion, the Idaho court held that this contention was not stated in the plain language of the statute, and ultimately exempted the Idaho OnePlan NMPs. *Id.* However, relating to the non-electronic submitted NMPs, the Court concluded that there was no statutory exemption, holding:

> If the Legislature should choose to make NMPs exempt from public inspection, it certainly could do so, as it has on a number of occasions for records compiled elsewhere which come into the hands of a public agency, such as court files of judicial proceedings, law enforcement records, trade secrets, draft legislation, tax commission records, and, ... certain information submitted via the Idaho One Plan.

*Id.* (additional citation omitted).

We further examine federal case law, and surmise that the U.S. District Court for the District of Columbia is a leading court in examining the issue. In *Zanoni v. U.S. Dep't of Agriculture,* 605 F.Supp.2d 230, 232 (D.D.C.2009), the plaintiff submitted a Freedom of Information Act ("FOIA") request to the Animal Plant Health Inspection Service regarding "... all records of registered premises contained in [databases], including the name of the entity, name of contact person,

address, telephone number, ..., and type of operation run on the premises." *Id.* at 233. The U.S. Department of Agriculture ("Agriculture Department") denied her request, alleging that FOIA exempted the documents from disclosure. *Id.* The plaintiff filed a complaint in the U.S. District Court, and the Court ordered that the Agriculture Department respond to the plaintiff's request. *See id.* at 234. The U.S. Department provided the entities' names, but did not disclose any further information. *Id.* Subsequently, both parties filed motions for summary judgment. *Id.*

The U.S. District Court examined the organic statute,[27] which provided:

[A]ny officer or employee of the [U.S.] Department of Agriculture ... shall not disclose ... information provided by an agricultural producer or owner of agricultural land concerning the agricultural operation, farming or conservation practices, or the land itself, in order to participate in programs of the [U.S.] Department.

*Id.* at 236. The Court determined that the information sought concerned an "agricultural operation, farming ... or the land itself," as it related to " '... the production and marketing of agricultural commodities and livestock.' " *Id.* at 237. Hence, the request was properly denied. *Id.* at 238.

Although not directly analogous to the case at bar, regarding NMPs, an individual's identification, and his or her per-

---

**27.** The General Assembly delegates "broad power to promulgate legislative-type rules or regulations in order to implement the statute" to agencies. *Adventist Health Care,* 392 Md. at 119, 896 A.2d 320 (quoting *Christ,* 335 Md. at 445, 644 A.2d 34). This statute is referred to as the agency's "organic statute." *See Marks v. Crim. Injuries Comp. Bd.,* 196 Md.App. 37, 57, 7 A.3d 665 (2010) (stating, "[o]ur review of an agency's determinations of law is plenary, although an agency's interpretation of its organic statute is entitled to some deference.") (citing *Total AV v. Dept. of Labor,* 360 Md. 387, 394, 758 A.2d 124 (2000)) (additional citation omitted). *See also Harford County People's Counsel v. Bel Air Realty Assocs. Ltd. P'ship,* 148 Md.App. 244, 258–59, 811 A.2d 828 (2002) (stating "[w]ith respect to statutory interpretation, we will likewise defer in the appropriate case to an agency's interpretation and application of its organic statute.") (citing *Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 68, 729 A.2d 376 (1999)).

sonal information, the next two cases assist our Court in understanding the analysis of the U.S. District Court for the District of Columbia concerning the disclosure, or exemption, of public documents relating to other confidential information, pursuant to FOIA.

In *Heartwood, Inc., et al. v. U.S. Forest Service,* 431 F.Supp.2d 28, 31 (D.D.C.2006), the plaintiff sought copies of individual draft reports of ecological assessments regarding national forests. The U.S. Forest Service ("Forest Service") stated that the draft reports were exempted pursuant to FOIA. *Id.* at 32. The plaintiff filed a complaint, and both parties filed motions for summary judgment. *Id.* at 33. The U.S. District Court for the District of Columbia stated that the purpose of the alleged exception was to "'protect [ ] the consultative functions of government by maintaining the confidentiality of advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies [were] formulated.'" *Id.* at 36. Amongst other reasons, the Court concluded that the documents were not protected because (1) the Forest Service was meticulous in not revealing recommendations or opinions, and (2) the Forest Service's employees obtained the drafts without disclosing any policy or preliminary positions. *Id.* at 37–38.

In *Defenders of Wildlife et al. v. U.S. Dep't of Agriculture,* 311 F.Supp.2d 44, 50–51 (D.D.C.2004), the plaintiffs submitted a FOIA request to the Agriculture Department regarding the disclosure of (1) all records relating to suspending national forest management regulations, and (2) a record of non-agency individuals who were contacted concerning reviewing, recommending, or amending the regulations. The Forest Service disclosed 166 pages, but exempted 636 pages of important documents from disclosure. *Id.* at 51. In addition to other documents, the exempted information included (1) redacted electronic communication to protect investigating personnel's personal information, (2) an outline that was redacted to protect the theories of the individuals, and (3) documents referring to conversations between agency personnel. *Id.* at

52. The plaintiffs filed a complaint, and both parties filed motions for summary judgment. *Id.*

The Court concluded that the Forest Service failed to illustrate that the documents included confidential information, and that because the documents "[did] not specify by name, title, and position, the exact authors or recipients of the documents[,]" the Court was unable to fully conclude whether the disclosed information was confidential. *See id.* at 59 (additional citation omitted). Thereby, the Court directed the parties to submit additional information with adequate detailed descriptions, so that it could determine whether the documents were exempted because it would reveal confidential data. *See id.* at 60.

In the case at bar, during the motions hearing, the following discussion ensued, and is pertinent to our analysis:

THE COURT: I guess that is what I am wondering. What do[es] [the MDA] do with the plans after three years?

[FARM BUREAU'S COUNSEL]: Well, they can destroy them, they can return them to—

THE COURT: Not what they can—

[FARM BUREAU'S COUNSEL]:—to the farmers.

THE COURT:—but what do they do? What has been the practice, what has been the policy? Do you know?

[FARM BUREAU'S COUNSEL]: I don't know what they do. My understanding is that they have a document retention policy that is their default document retention policy and that allows them to keep the plans for longer than three years....

\*      \*      \*

THE COURT: And I think that is where I am struggling because I don't know what the Agriculture Department does with the plans that they have. I mean I—I know that they collect all of the information.... But what happens actually to the plans, Mr. Schlick[, MDA's counsel], after three years? ...

[MDA'S COUNSEL]: There is a statute, Your Honor. The Department keeps them and wishes to keep them for these reasons. First, they establish a baseline for a particular farm so that when a new filing is made that can be compared—

THE COURT: Where is the statute—what am looking at?

[MDA'S COUNSEL]: The statute is the Public Records Law, Your Honor.

THE COURT: Okay.

[MDA'S COUNSEL]: And the Public Records Law is State Government 10–639. And that provides—

THE COURT: Hold on. State Government—

[MDA'S COUNSEL]:—that a public—10–639, which provides that a public official shall offer to be archived, the state archives, any public record of the official that no longer is needed.

There is also a criminal statute, Criminal Law 8–606(B), which prohibits a state official from—or employee from—

THE COURT: What was it, again?

[MDA'S COUNSEL]: Criminal Law 8–606B [sic], which prohibits the unauthorized destruction of public records....

\*　　\*　　\*

[MDA'S COUNSEL]: One of the factors in enforcement is whether a violation was willful, and one factor the Department might consider is historical compliance. So, we need these historical plan records in order to determine historical compliance and therefore the sanctions for noncompliance. It is also necessary to keep these plan information [sic] to identify trends in nutrient management and to assess the success of the program overall....

We concur with the judgment of the circuit court, and offer a comprehensive analysis of the pertinent reasons regarding our determination. First, the NMPs at issue constitute public records pursuant to the Public Information Act, and it permits the public to inspect any public record at any reasonable time. Moreover, if we determine that the General Assembly intend-

ed to offer an exemption concerning NMP documents for three years, but after, the NMP records could be disclosed, this interpretation would frustrate the purpose of Agric. § 8–306(b)'s language. Thus, Agric. § 8–306's required soil conservation and water quality plans would be forever exempt from disclosure. Lastly, the MDA articulated the reasons why it possessed the NMP documents beyond three years, and neither reason concerned confidentiality of the permit applicant's identity. Instead, the reasons were comparisons of the original and new filings, determining whether there was a willful violation by examining past compliance, and ascertaining the impact and success of the program.

As Judge Harrell stated in *Whitley,* 429 Md. at 153, 55 A.3d 37 "[i]n construing a statute, we must keep in mind also the purpose of the provisions at issue." (citing *Barbre v. Pope,* 402 Md. 157, 172, 935 A.2d 699 (2007)) (noting that the Court's primary goal in statutory construction was to " 'discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision' "). In the 2011 order, the circuit court (emphasis added):

ORDERED and DECLARED that the [MDA] must redact any information from any documents subject to disclosure under the Public Information Act that are related to [NMPs] if such information would allow for the identification of the individual for whom the [NMP] was prepared with respect to those [NMP] [s]ummaries that have been maintained by the [MDA] for three years or less. In applying this standard, the [MDA] must redact only that information ... with a specific [NMP]; and it is further: ORDERED and DECLARED that, as applied to the spreadsheet of enforcement information that the [MDA] will provide to the Assateague Coastkeeper, the [MDA] must redact the following fields of information in their entirety ... :[28]

---

**28.** The spreadsheet related to Assateague Coastkeeper's April 2010 filing, requesting NMPs and reports regarding any Worcester County farm that violated the provisions of the Water Quality Improvement Act

■ . . .—Visit Type[s], Operation Type[s]

*   *   *

■ . . .—Total Farmed Acres

*   *   *

In addition, the [MDA] must review the following fields of information and redact any plan information that could be used to create a linkage between a specific individual and a specific [NMP]:

■ . . .—Compliance Comments

*   *   *

and it is further:

ORDERED and DECLARED that, in redacting identifying information from [NMP] summaries or annual implementation reports, **the [MDA] must redact the entries for name, address, signature, and unique identification number. . . .**

IT IS SO ORDERED.

(signature omitted)

Accordingly, we agree with the circuit court's judgment because it strikes a balance between the principled policy of permitting the public to inspect and evaluate public reports pursuant to the Public Information Act, all while continuing to remain sensitive to the applicant's personal information, specifically his or her identity. The circuit court's ruling was beneficial to each party, as appellants had access to the NMP documents, and the Farm Bureau's members had protection regarding their identities and personal information.

Pursuant to the above reasoning, we conclude that the General Assembly intended that NMP documents could be disclosed regardless of the year, but that the MDA must protect identifying information that would reveal specific ap-

---

during 2007 through 2010. In response, the MDA prepared a spreadsheet, but initially, the circuit court instructed the MDA not to release any of the contested records.

plicant's identity during disclosure of such documents. We therefore affirm the circuit court's judgment.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY IS AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**